No. 99-323

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 288

302 Mont. 228

14 P.3d 456

STATE OF MONTANA,

Plaintiff and Respondent.

v.

GREGORY ELISON,

Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Maurice R. Colberg, Jr., Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kevin R. Peterson, Deputy Public Defender, Billings, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; John Paulson,

Assistant Attorney General, Helena, Montana

Dennis Paxinos, Yellowstone County Attorney; Sheila R. Kolar,

Deputy County Attorney, Billings, Montana

Submitted on Briefs: January 20, 2000
Decided: November 16, 2000

Filed:

_____

Clerk

Justice Jim Regnier delivered the opinion of the Court.

¶1 Gregory Elison appeals from the Court's Findings of Fact, Conclusions of Law, Memorandum and Order issued by the Thirteenth Judicial District Court, Yellowstone County, denying his motion to suppress. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

¶2 Elison's appeal raises the following issues:

¶3 1. Whether the District Court erred in finding that Officer Conrad had a particularized suspicion sufficient to justify stopping Elison's vehicle?

¶4 2. Whether the District Court erred in concluding that Elison was not entitled to *Miranda* warnings prior to preliminary questioning?

¶5 3. Whether the District Court erred in concluding that Elison's vehicle was lawfully searched under an exception to the warrant requirement?

BACKGROUND

¶6 On August 1, 1998, shortly after midnight, Billings Police Officer Scott Conrad was on routine patrol eastbound on Fourth Avenue North in Billings, Montana. Jerry Gibson was riding with Officer Conrad as an authorized citizen observer. While Officer Conrad's patrol vehicle was passing through the intersection of Fourth Avenue North and North 26th Street, Gibson saw the driver of a white truck in the lane immediately to the right of Officer Conrad's vehicle hunched over the steering wheel smoking from a brass-colored pipe. Gibson made eye contact with the driver of the truck, who was later identified as

Elison. Gibson testified that Elison noticed the patrol car, appeared startled, and lowered the pipe and lighter below the steering wheel.

¶7 As the patrol car proceeded through the intersection, Gibson informed Officer Conrad that he saw the driver of a white truck smoking from what he believed to be a marijuana pipe and that the driver noticed the patrol car, appeared startled and attempted to hide the pipe. Officer Conrad had not witnessed any of this activity. Officer Conrad located the white truck behind his patrol car and reduced his speed to allow the truck to pass his car so that he could get behind Elison's vehicle and make a traffic stop. Elison slowed his vehicle. Finally, Officer Conrad brought his vehicle to a complete stop so that Elison would pass him. He then activated his overhead lights and siren and stopped Elison's vehicle.

¶8 Upon stopping, Elison exited his truck. Officer Conrad instructed Elison to return to his vehicle and Elison complied. Officer Conrad testified that when he approached Elison's truck, he could immediately smell the odor of marijuana. He also testified that Elison appeared nervous, his eyes were red and glassy, and he would not sit still. Officer Conrad informed Elison of the reason for the stop-advising him of Gibson's observations and the odor of marijuana which Conrad had detected. Elison appeared to be reaching in between the seat cushions of the truck. Officer Conrad asked Elison to show him his right hand and subsequently requested that Elison exit his vehicle.

¶9 After Elison exited the truck, Officer Conrad directed him to the rear of the pickup, frisked him, and asked him where the pipe that Gibson had reported seeing him smoking from was located. Elison told Officer Conrad that he had thrown it out the window. Officer Conrad then asked Elison whether there was any marijuana in the truck. Elison replied that he had tucked marijuana behind the seat. Officer Conrad testified that Elison was not free to leave during this questioning. Officer Conrad returned to the vehicle, leaving Elison with another police officer who had arrived on the scene a few minutes after Officer Conrad had stopped Elison. Officer Conrad opened the door, tilted the driver's seat forward and discovered a film canister which he removed and opened. While searching the vehicle, he also observed a paper bindle near the film canister as well as a two-inch tube on the seat and a razor blade on the floor board.

¶10 Officer Conrad showed the film canister to Elison and Elison informed him that it contained marijuana. Officer Conrad then informed Elison that he was under arrest, handcuffed him, and put him in the rear seat of his patrol car. At that time, Officer Conrad

advised Elison of his *Miranda* rights and asked Elison for consent to search the truck. Elison gave verbal and written consent. Sergeant Schieno of the Yellowstone County Sheriff's Department arrived with a trained drug-sniffing canine. Sergeant Schieno deployed his dog and subsequently advised Officer Conrad that the dog had indicated the presence of drugs in the cab of the truck. Upon receiving this information, Officer Conrad searched the vehicle. He seized the paper bindle, straw, and razor blade that he had previously observed and located another bindle in an open compartment in the dash of the truck. Gibson and another officer located a brass pipe a few blocks down the street. The items seized later tested positive for marijuana and methamphetamine.

¶11 On August 5, 1998, Elison was charged with felony possession of dangerous drugs, misdemeanor possession of dangerous drugs, and misdemeanor possession of drug paraphernalia. Elison filed a Motion to Suppress and Request for Evidentiary Proceeding. The District Court held an evidentiary hearing regarding Elison's motion to suppress and, on January 22, 1999, the court denied Elison's motion. On February 17, 1999, Elison pled guilty to felony possession of dangerous drugs. The court granted the State's motion to dismiss the other counts. On April 5, 1999, the court entered an Order Deferring Imposition of Sentence deferring Elison's sentence for two years with probationary conditions, including a $500 fine. Elison appeals the court's denial of his motion to suppress.

## STANDARD OF REVIEW

¶12 We review a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous, and whether those findings were correctly applied as a matter of law. *State v. Dawson,* 1999 MT 171, ¶ 13, 295 Mont. 212, ¶ 13, 983 P.2d 916, ¶ 13.

## ISSUE ONE

¶13 Whether the District Court erred in finding that Officer Conrad had a particularized suspicion sufficient to justify stopping Elison's vehicle?

¶14 The District Court found that Officer Conrad had a particularized and objective basis for suspecting that Elison was committing an offense and was, therefore, entitled to stop Elison's truck. Elison contends that the District Court's finding is clearly erroneous because Officer Conrad did not inquire as to the basis of Gibson's assumptions regarding

his observations, in particular Gibson's assumption that Elison was using the pipe to smoke marijuana. Elison also contends that Officer Conrad did not make any observations himself which corroborated Gibson's report.

¶15 The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect persons against unreasonable searches and seizures, including brief investigatory stops such as traffic stops. *State v. Jarman*, 1998 MT 277, ¶ 9, 291 Mont. 391, ¶ 9, 967 P.2d 1099, ¶ 9. We have held that in order to show sufficient cause to stop a vehicle, the burden is on the State to show that law enforcement had "particularized suspicion:" (1) objective data from which an experienced police officer can make certain inferences; and (2) a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing. *State v. Gopher* (1981), 193 Mont. 189, 194, 631 P.2d 293, 296 (adopting test announced in *United States v. Cortez* (1981), 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621); *State v. Gilder*, 1999 MT 207, ¶ 8, 295 Mont. 483, ¶ 8, 985 P.2d 147, ¶ 8.

¶16 Whether particularized suspicion exists at the time of an investigative stop is a question of fact which is determined by considering the totality of the circumstances. *State v. Lafferty*, 1998 MT 247, ¶ 10, 291 Mont. 157, ¶ 10, 967 P.2d 363, ¶ 10. "In evaluating the totality of the circumstances, a court should consider the quantity, or content, and quality, or degree of reliability, of the information available to the officer." *State v. Pratt* (1997), 286 Mont. 156, 161, 951 P.2d 37, 40 (citing *Alabama v. White* (1990), 496 U.S. 325, 330, 110 S. Ct. 2412, 2416, 110 L. Ed. 2d 301, 309). Where an investigative stop stems from the tip of a citizen informant, this Court has adopted a three-part test to determine the reliability of the citizen informant's information: "(1) whether the citizen informant identified herself to the authorities and thus exposed herself to civil and criminal liability if the report is false; (2) whether the report is based upon the citizen informant's personal observations; and (3) whether the officer's own observations corroborated the informant's information." *State v. Roberts*, 1999 MT 59, ¶ 17, 293 Mont. 476, ¶ 17, 977 P.2d 979, ¶ 17 (citing *Pratt*, 286 Mont. at 165, 951 P.2d at 42-43).

¶17 Elison agrees that the first element of the *Pratt* test was met. Officer Conrad knew Gibson's identity: Gibson was sitting next to Officer Conrad when he made his report. Elison argues that the second element of *Pratt* was not met in that Gibson did not have a sufficient basis of knowledge. Elison contends that Gibson's report did not establish an adequate foundation for Officer Conrad's suspicion because Officer Conrad did not know whether Gibson was trained in narcotics identification. Therefore, Elison maintains, there

was no evidence to suggest that Gibson's report that Elison was smoking marijuana was reliable. The State contends that the facts of the instant case are indistinguishable from *Pratt.* We agree.

¶18 In *Pratt*, we cited with approval a portion of our decision in *State v. Lee* (1997), 282 Mont. 391, 938 P.2d 637, in which we underscored the importance of the informant providing law enforcement with the basis for his or her belief that a particular person was engaged in criminal activity. *Pratt*, 286 Mont. at 162-63, 951 P.2d at 41. We emphasized that in *Lee* the informant's report was not sufficiently reliable because the informant did not provide the dispatcher with any basis for her belief that Lee was driving under the influence of alcohol or speeding. *Pratt*, 286 Mont. at 163-64, 951 P.2d at 41-42.

¶19 Gibson relayed to Officer Conrad both his conclusion that Elison was smoking from a pipe that looked like a marijuana pipe, as well as his personal observations that formed the basis for that belief. Gibson told Officer Conrad that he saw Elison smoking something from a brass-colored pipe and that Elison appeared startled and lowered his pipe and lighter when he noticed Gibson was observing him. Regardless of Gibson's ability to correctly identify marijuana, he supplied Officer Conrad with sufficient objective and particularized facts for Officer Conrad to determine for himself whether Gibson's conclusion that Elison was smoking marijuana was warranted. *See People v. Rueda* (Colo. 1982), 649 P.2d 1106, 1109 (holding that report from two maintenance men that locker held bag containing a white powdery substance which they concluded was "dope," plus other suspicious circumstances, was sufficient for probable cause).

¶20 We are also convinced that Officer Conrad's corroboration of Gibson's report was sufficient. Elison argues that Officer Conrad did not sufficiently corroborate Gibson's report because Officer Conrad did not personally witness any illegal activity. However, we have not required that an officer personally observe illegal activity in order to have a particularized suspicion justifying a traffic stop. In *Pratt*, we stated that where an informant's tip is anonymous and lacks any indication of the basis for the informant's opinion, the officer must corroborate the tip by observing suspicious behavior that alerts the officer to the existence of a possible violation. 286 Mont. at 168, 951 P.2d at 44; *accord Lafferty*, ¶ 12 (holding that an anonymous informant's report of criminal conduct which did not state the basis for the informant's belief must be corroborated by an officer's personal observations of illegal or suspicious activity). However, a particularized suspicion does not require certainty on the part of the law enforcement officer. *Dawson*, ¶ 18. Where a tip is more reliable, such as those circumstances where the informant's

identity is known and the informant reports his or her personal observations which led the informant to believe that criminal conduct had occurred, corroboration of innocent behavior by law enforcement may be sufficient to raise a particularized suspicion. *Pratt*, 286 Mont. at 168, 951 P.2d at 44.

¶21 As in *Pratt*, Officer Conrad observed "the described vehicle within a short period of time, traveling in the direction and on the same street indicated by [the informant]." 286 Mont. at 166, 951 P.2d at 43. Furthermore, Officer Conrad testified that after substantiating Gibson's description of Elison's vehicle and locating its position behind his patrol car, the following occurred:

> [W]hen I tried to make a traffic stop, I slowed down and I wanted to make a right lane change to get behind Mr. Elison's vehicle. Looking in my rearview mirror, he also slowed down. [Elison's] truck slowed down, got behind me, made another left turn, got into my left-side lane. I slowed down to 20 miles per hour, and the vehicle-the truck also slowed down. I had to make a complete stop in order to get behind the vehicle.

Officer Conrad testified that Elison's driving was unusual and appeared suspicious. We agree. In light of Gibson's report that Elison was aware he had been witnessed smoking from a pipe, Elison's subsequent behavior does appear suspicious; it could reasonably be interpreted as an attempt by Elison to avoid being stopped.

¶22 Accordingly, even if we were to disregard Gibson's inference that Elison was smoking marijuana, Officer Conrad had the following information available to him prior to stopping Elison's vehicle: Gibson's report based on his personal observation of Elison smoking from a brass pipe, appearing startled upon noticing the patrol car and attempting to hide the pipe from view; Officer Conrad's corroboration of Gibson's description of the vehicle; and Officer Conrad's independent observation of Elison's subsequent driving behavior which appeared suspicious in light of Gibson's report. These facts are reliable objective data from which Officer Conrad could make certain inferences, based on his four years of experience and training, which would lead to a resulting suspicion that Elison was engaged in wrongdoing.

¶23 The District Court's finding that from the totality of the circumstances Officer Conrad had a particularized suspicion which justified stopping Elison is not clearly erroneous.

## ISSUE TWO

¶24 Whether the District Court erred in concluding that Elison was not entitled to a *Miranda* warning prior to preliminary questioning?

¶25 The District Court concluded that Elison was not entitled to *Miranda* warnings prior to preliminary questioning because Officer Conrad was merely conducting an investigatory stop to determine whether a crime was being committed, and it was within his discretion to ask Elison investigatory questions designed to identify him as a suspect in a reported crime before giving Elison *Miranda* warnings. Elison contends that he was entitled to *Miranda* warnings because Officer Conrad testified that Elison was not free to leave during this preliminary questioning and Officer Conrad's questions were not investigatory in that they were not designed to determine whether Elison was a suspect in a reported crime.

¶26 The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, the Supreme Court addressed the problem of protecting a suspect's right against compelled self-incrimination in the context of custodial interrogation. The Court held that the prosecution may not use statements stemming from a custodial interrogation unless the defendant is advised prior to questioning of the right to remain silent, that any statement may be used as evidence against the defendant, and that the defendant has a right to the presence of an attorney. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. By custodial interrogation, the court meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her or] his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. *Miranda* continues to constrain the admission of statements in state court proceedings made by a suspect during custodial interrogation and not preceded by sufficient warnings. *See, e.g., Berkemer v. McCarty* (1984), 468 U.S. 420, 428, 104 S. Ct. 3138, 3144, 82 L. Ed. 2d 317.]

¶27 Elison is entitled to the protections of *Miranda* only if he was subject to "custodial interrogation." *Dawson*, ¶ 30. People are "in custody" for the purposes of Miranda if they have been deprived of their freedom of action in any significant way or their freedom of action has been curtailed to a degree associated with a formal arrest. *Dawson,* ¶ 30. In *Dawson*, we stated:

This Court has previously held that law enforcement officers need not administer *Miranda* warnings to suspects during brief investigative encounters even if those encounters are somewhat coercive. Moreover, we have stated that an interrogation is not custodial unless there is a significant restriction of personal liberty similar to an arrest . . . and even temporary confinement as a safety precaution does not render the detention "custodial" for *Miranda* purposes . . . .

*Dawson, ¶ 35 (citations omitted).*

¶28 We noted in *Dawson* that the trial court had also relied upon this Court's decision in *State v. Rushton* (1994), 264 Mont. 248, 870 P.2d 1355, in denying Dawson's motion to suppress his statement. *Dawson,* ¶ 33. In *Rushton*, we stated that the determination of whether a "custodial interrogation" has occurred is made on a case-by-case basis and looks to whether a "reasonable person" would feel free to leave after considering such factors as the time and place of the questioning, the length and mood of the questioning, and the presence of other persons during the questioning. *Rushton*, 264 Mont. at 256, 870 P.2d at 1360. However, we note that while consideration of these factors might be useful, the ultimate inquiry is not whether a reasonable person would feel free to leave, but rather whether there was a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California* (1994), 511 U.S. 318, 322, 114 S. Ct. 1526, 1529, 128 L. Ed. 2d 293. *See also Combs v. Coyle* (6th Cir. 2000), 205 F.3d 269, 284 (quoting *Stansbury*); *State v. Mirquet* (Utah 1996), 914 P.2d 1144, 1147 (observing that "[i]n the context of a routine traffic stop, the driver and the passengers, even though they have been stopped and, at least momentarily, are not free to leave, are not 'in custody' for *Miranda* purposes"); *Allen,* ¶ 13 (holding that the defendant who was the subject of a traffic stop and not free to leave was, nonetheless, not entitled to *Miranda* warnings).

¶29 In *Berkemer*, the Supreme Court considered whether roadside questioning of a motorist detained pursuant to a traffic stop should be considered custodial interrogation for purposes of *Miranda*. The Court acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and passengers, if any, of the detained vehicle." 468 U.S. at 436, 104 S. Ct. at 3148. The Court also noted that under the law of most States it is a crime to leave a traffic stop without permission and "few motorists would feel free to . . . leave the scene of a traffic stop without being told they might do so." 468 U.S. at 436, 104 S. Ct. at 3148. However, these factual observations did not end the Court's inquiry into whether the defendant was subjected to custodial interrogation. Instead, the Court focused on whether the defendant had demonstrated that the officer's conduct before eliciting the

incriminating statement was "comparable to those [restraints] associated with formal arrest." *Berkemer*, 468 U.S. at 441, 104 S. Ct. at 3151. In this regard, the Supreme Court observed that "the usual traffic stop is more analogous to a so-called '*Terry* stop,' . . . than to a formal arrest." *Berkemer*, 468 U.S. at 439, 104 S. Ct. at 2150 (discussing *Terry v. Ohio* (1968)), 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889). The Court decided that statements made by a defendant in response to an officer's roadside questioning did not require warnings of constitutional rights because of the brevity of questioning and its public setting, even though few motorists would feel free to leave. *Berkemer*, 468 U.S. at 436-39, 104 S. Ct. at 3148-49. We have repeatedly cited *Berkemer* with approval. *See Allen*, ¶ 13; *City of Billings v. Skurdal* (1986), 224 Mont. 84, 89, 730 P.2d 371, 374.

¶30 The circumstances surrounding Officer Conrad's questioning of Elison are as follows: Upon stopping Elison, Officer Conrad called the dispatcher and informed the dispatcher of the stop. In the meantime, Elison had exited his vehicle and approached the patrol car. Officer Conrad instructed Elison to return to his vehicle. Officer Conrad then approached Elison's vehicle, and asked Elison for a driver's licence. Officer Conrad informed Elison of Gibson's observations and told Elison that he smelled marijuana. Officer Conrad testified that Elison appeared nervous and kept reaching between the cushions of the pickup seat with his right hand. As a result of Elison's behavior, Officer Conrad asked Elison to show his right hand and exit his vehicle. Officer Conrad then directed Elison to the rear of his pickup, frisked him, and asked him where the pipe that Gibson had reported observing was located. Elison informed Officer Conrad that he had thrown it out the window. Officer Conrad then asked Elison whether there was any marijuana in the truck. Elison replied that he had tucked marijuana behind the seat. Officer Conrad returned to the vehicle, leaving Elison with another police officer who had arrived on the scene in a separate vehicle about a minute after the stop. Officer Conrad moved the seat of the pickup and retrieved a film canister. Officer Conrad opened the canister and asked Elison if it contained marijuana. Elison informed him that it did. Officer Conrad placed Elison under arrest, handcuffed him, and placed him in the patrol car. Officer Conrad testified that Elison was not free to leave during this questioning. Gibson estimated that five to ten minutes elapsed between the time Officer Conrad stopped Elison and the time Officer Conrad placed Elison in the patrol car.

¶31 The issue as defined by *Berkemer* is whether the circumstances surrounding Officer Conrad's questioning could be fairly characterized as the functional equivalent of a formal arrest when viewed from the perspective of a reasonable person in Elison's position. *See Berkemer*, 468 U.S. at 442, 104 S. Ct. at 3151. Elison has failed to demonstrate that, at any

time between the initial stop and his actual arrest, he was subjected to restraints comparable to those associated with a formal arrest. Elison points to the fact that Officer Conrad testified that Elison was not free to leave during the questioning which occurred at the rear of Elison's vehicle. However, Officer Conrad did not communicate this fact to Elison. "[A] policeman's unarticulated plan has no bearing on the question of whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood [his or her] situation." *Berkemer*, 486 U.S. at 442, 104 S. Ct. at 3151; *accord Stansbury*, 511 U.S. at 324-25, 114 S. Ct. at 1529; *Allen*, ¶ 13. *See also Evans v. Montana Eleventh Judicial Dist. Court, Flathead County* (Mont. Feb. 11, 2000), 2000 WL 201971, at *3 (discussing definition of "youth taken into custody for questioning" pursuant to § 41-5-331, MCA).

¶32 Elison also claims that Officer Conrad's prearrest questioning exceeded the scope of the stop because it was not designed to determine whether he was a suspect in a crime. "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" *Berkemer*, 468 U.S. at 439, 104 S. Ct. at 3150 (quoting *United States v. Brignoni-Ponce* (1975), 422 U.S. 873, 881, 95 S. Ct. 2547, 2580, 45 L. Ed. 2d 607). In this regard, an officer may ask the detainee a moderate number of questions to determine the detainee's identity and to try to obtain information confirming or dispelling the officer's suspicions before the requirements of *Miranda* attach. *Berkemer*, 468 U.S. at 439, 104 S. Ct. at 3150. We think Officer Conrad's questions were reasonably related to the reason for the stop and designed to dispel his particularized suspicion that Elison had been smoking marijuana: he asked Elison where the pipe was which Gibson had reported observing and he asked Elison whether Elison had any marijuana in his vehicle.

¶33 None of the other aspects of the interaction between Elison and Officer Conrad support the contention that Elison was subject to custodial interrogation prior to his arrest. While Elison was clearly not free to leave during Officer Conrad's prearrest questioning, nor would a reasonable person have felt free to leave, Elison was not subject to restraint on his freedom of movement of the degree associated with a formal arrest until he was handcuffed and placed in the back of Officer Conrad's patrol car. Prior to Elison's actual arrest, he was subject to the same restraints that any motorist might expect to be subjected to during a routine *Terry* stop. Officer Conrad removed him from his vehicle and frisked him, both justifiable law enforcement actions during a *Terry* stop.[1] *See Dawson*, ¶ 25; *see also Terry*, 392 U.S. at 30, 88 S. Ct. at 1884-85 (holding that an officer is entitled to conduct "a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him"). Officer Conrad asked Elison

questions designed to dispel Officer Conrad's particularized suspicion, also a justifiable action during a *Terry* stop. The prearrest questioning was in a public setting and in the presence of only one other law enforcement officer. *See Berkemer*, 468 U.S. at 438-39, 104 S. Ct. at 3149-50. Lastly, the prearrest questioning was brief and at no point during the interval between his stop and his arrest did Officer Conrad inform Elison that his detention would not be temporary. *See Berkemer*, 468 U.S. at 441-42, 104 S. Ct. at 3151. A reasonable person in Elison's position would have assumed that, barring the discovery of any evidence supporting Officer Conrad's suspicions, he would be free to leave after the questioning was completed. *See Combs*, 205 F.3d at 284-85 (holding that the defendant was "in custody" because a reasonable person in the defendant's position would have believed he was under arrest).

¶34 We hold that the District Court correctly denied Elison's motion to suppress his prearrest statements.

ISSUE THREE

¶35 Whether the District Court erred in concluding that Elison's vehicle was lawfully searched under an exception to the warrant requirement?

¶36 The District Court concluded that Elison's vehicle was lawfully searched without a warrant because Officer Conrad had probable cause to believe that there was marijuana in the truck and there were exigent circumstances which excused the obtaining of a warrant. The court based its finding of probable cause on the fact that Officer Conrad smelled what he believed to be burned marijuana, Elison indicated that there was marijuana in the truck, and a trained drug dog indicated the presence of drugs in the truck.[2] In reaching a finding of exigent circumstances, the court noted the mobility of the vehicle and the possibility that a confederate could move the vehicle. The court also noted that the stop was made at 12:05 a.m., and that it would have been difficult to obtain a search warrant at that hour. The court took judicial notice of the fact that judges or magistrates are not reasonably available to obtain a search warrant at that time of night.

¶37 Elison contends that the District Court's finding of exigent circumstances is clearly erroneous and, as a result, the search of his automobile did not fall within an exception to the warrant requirement. Elison claims that the possibility that a confederate could have moved his vehicle prior to law enforcement obtaining a warrant is without support in the record and, in fact, was contrary to Officer Conrad's testimony. In this regard, Elison notes

that he did not have a passenger with him when the stop occurred, he was in the squad car in handcuffs with no means of communication, Officer Conrad testified that he was not aware of anyone who might move the vehicle, and Officer Conrad testified that he made no attempt to secure a warrant. Elison also claims that the District Court abused its discretion by taking judicial notice of the unavailability of judges or magistrates at the time of night the stop was made.

¶38 The State claims that the finding of exigency was justified due to the mobility of Elison's vehicle and the difficulty in securing a search warrant at the time of Elison's arrest. The State asserts that the court did not abuse its discretion by taking judicial notice of the fact that judges and magistrates are not reasonably available at 12:05 a.m. in Billings, Montana, because the fact was within the actual and immediate knowledge of the court. In the alternative, the State urges that we conclude that a warrantless search of a vehicle is permitted where the vehicle is readily mobile and an officer has probable cause to believe that the vehicle contains contraband or other evidence of a crime.

¶39 The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution prohibit unreasonable searches and seizures, including unreasonable searches of automobiles by law enforcement personnel. *See State v. Allen* (1992), 256 Mont. 47, 884 P.2d 105. Warrantless searches and seizures are per se unreasonable subject to only a few carefully drawn exceptions. *State v. Loh* (1996), 275 Mont. 460, 468, 914 P.2d 592, 597. One exception to the warrant requirement is the so-called "automobile exception." *Allen*, 256 Mont. at 51, 884 P.2d at 108. *See also California v. Carney* (1985), 471 U.S. 386, 390, 105 S. Ct. 2066, 2068, 85 L. Ed. 2d 406.

¶40 In *Carney*, the United States Supreme Court stated that the "automobile exception" is based on two grounds. One basis for the exception is exigency. According to the Court, the warrant requirement is excused based on the capacity of a vehicle to be quickly moved which "creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible." *Carney*, 471 U.S. at 391, 105 S. Ct. at 2069. The other basis of the exception is a reduced expectation of privacy. According to the Court, individuals have a reduced expectation of privacy on account of the pervasive regulation of vehicles capable of traveling on public highways and are, therefore, on notice that they may be stopped and searched without the protection afforded by a warrant. *Carney*, 471 U.S. at 392, 105 S. Ct. at 2069-70. "In short, the pervasive schemes of regulation, which necessarily lead to reduced expectations of privacy, and the exigencies attendant to ready mobility, justify searches without prior recourse to authority

of a magistrate so long as the overriding standard of probable cause is met." *Carney*, 471 U.S. at 392, 105 S. Ct. at 2070.

¶41 As clarified by subsequent Supreme Court decisions, a warrantless search of an automobile does not violate the Fourth Amendment if the automobile is "readily mobile and probable cause exists to believe it contains contraband;" a further showing of exigent circumstances is unnecessary. *Pennsylvania v. Labron* (1996), 518 U.S. 938, 940, 116 S. Ct. 2485, 2487, 135 L. Ed. 2d 1031 (per curiam); *Maryland v. Dyson* (1999), 527 U.S. 465, 119 S. Ct. 2013, 144 L. Ed. 2d 422 (per curiam) (summarily reversing Maryland Court of Special Appeals which had concluded that a warrantless automobile search violated the Fourth Amendment because there was no exigency that prevented or even made it significantly difficult for the police to obtain a search warrant).

¶42 Officer Conrad certainly had probable cause to believe Elison's vehicle contained evidence of a crime after Elison informed Officer Conrad that he had tucked marijuana behind his seat. Elison's vehicle was also readily mobile-he had just been driving it. Under the Fourth Amendment to the United States Constitution, the warrantless search of Elison's vehicle was not unreasonable.

¶43 We have also recognized an "automobile exception" to the warrant requirement under Article II, Section 11 of the Montana Constitution. However, unlike the United States Supreme Court, we have continued to require a showing of exigent circumstances. *See, e. g., Allen,* 256 Mont. at 51, 884 P.2d at 108. In *Allen*, we stated that the "automobile exception . . . requires two things (1) the existence of probable cause to search; and (2) the presence of exigent circumstances, that is, that it was not practicable under the circumstances to obtain a warrant." 256 Mont. at 51, 884 P.2d at 108.

¶44 We first recognized the automobile exception to the warrant requirement in *State v. Spielman* (1973), 163 Mont. 199, 516 P.2d 617. In *Spielman*, the vehicle in which the defendants had been traveling was searched without a warrant after being stopped on a public highway. We stated that the issue was whether the patrolmen had probable cause to execute the search. *Spielman*, 163 Mont. at 206, 516 P.2d at 621. However, we did not discuss at length the necessity of a separate showing of exigency. Our first opportunity to discuss the exigency requirement came in *State v. Amor* (1974), 164 Mont. 182, 520 P.2d 773. In *Amor*, we affirmed the suppression of evidence seized pursuant to a warrantless search of a parked and unoccupied vehicle because it was practicable for the officers involved to obtain a warrant prior to their search. In affirming the District Court's granting

of Amor's motion to suppress, we stated that "[i]n no case may the existence of exigent circumstances be predicated upon the mere fact that the object of the search was an automobile." *Amor*, 164 Mont. at 184-85, 520 P.2d at 775. We have consistently reaffirmed the requirement that, in order to justify a warrantless search of an automobile, the State must show exigent circumstances under which it was not practicable to obtain a warrant. *State v. Cripps* (1978), 177 Mont. 410, 422, 582 P.2d 312, 319; *Allen*, 256 Mont. at 51, 884 P.2d at 108; *State v. McCarthy* (1993), 258 Mont. 51, 852 P.2d 111; *State v. Lott* (1995), 272 Mont. 195, 900 P.2d 306.

¶45 As the State correctly observes, however, we have never clearly stated a separate justification for the exigency requirement under Montana law. We hereby take this opportunity to clarify the source of the exigency requirement. As we have previously stated:

> The Montana Constitution also provides that the people shall be free from unreasonable searches and seizures. Mont. Const. Art. II, § 11. Although the language of this provision is nearly identical to that contained in the Fourth Amendment to the United States Constitution, we recognize that such a provision in the Montana Constitution may be interpreted so as to provide a greater amount of rights than that contained in the Federal Constitution. See, *State v. Johnson* (1986), [221] Mont. [503, 513], 719 P.2d 1248, 1254-55; and *Butte Community Union v. Lewis* (1986), [219] Mont. [426, 433], 712 P.2d 1309, 1313. Additionally, the Montana Constitution provides that the right of individual privacy shall not be infringed without the showing of a compelling state interest. Mont. Const. Art. II, § 10. There is no similar textual language in the United States Constitution and we have therefore recognized that this section grants rights beyond that inferred from the United States Constitution. *See generally*, *Montana Human Rights Division v. City of Billings* (1982), 199 Mont. 434, 649 P.2d 1283. Because Montana's Constitutional protections have an existence which is separate from the Federal Constitutional protections it is necessary to offer an independent analysis of the privacy and search and seizure provisions of the Montana Constitution.

*State v. Bullock* (1995), 272 Mont. 361, 383, 901 P.2d 61, 75.

¶46 We have repeatedly held that Montana's unique constitutional language affords citizens a greater right to privacy, and, therefore, provides broader protection than the Fourth Amendment in cases involving searches of private property. *See Bullock*, 272

Mont. at 384, 901 P.2d at 75; *Hulse v. Department of Justice*, 1998 MT 108, ¶ 25, 289 Mont. 1, ¶ 25, 961 P.2d 75, ¶ 25. As a result, we have concluded that the category of warrantless searches which may be lawfully conducted under the Montana Constitution is narrower than the category of warrantless searches which may be conducted pursuant to the Fourth Amendment. For example, in *Bullock*, we held that a warrantless search of the defendant's open field, although lawful under the Fourth Amendment, was unlawful under the Montana Constitution. 272 Mont. at 385, 901 P.2d at 76.

¶47 Montana's Constitution not only confers greater protection from warrantless searches of open fields, but also confers greater protection from warrantless searches of automobiles. For instance, in *State v. Sawyer* (1977)*,* 174 Mont. 512, 518, 571 P.2d 1131, 1134, we declined to follow the Supreme Court's decision in *South Dakota v. Opperman* (1976), 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000, which recognized the lawfulness of warrantless inventory searches of automobiles pursuant to standard police procedures. On the basis of Montana's constitutional right to privacy, we restricted warrantless inventory searches of automobiles to those searches whose purpose was to safeguard articles within plain view of the officer's vision. *Sawyer,* 174 Mont. at 518, 571 P.2d at 1134. While so holding, we reaffirmed our observation that "the word 'automobile' is not a talisman in whose presence the . . . [warrant requirement] fades away and disappears." *Sawyer*, 174 Mont. at 517, 571 P.2d at 1133. Accordingly, we will analyze the warrantless search of Elison's vehicle under our unique constitutional provisions.

¶48 We have defined "search" as the use of some means of gathering evidence which infringes upon a person's reasonable expectation of privacy. *Hulse*, ¶ 22. When determining whether there has been an unlawful governmental intrusion into one's privacy in search and seizure situations, we look at the following factors: (1) whether the person has an actual expectation of privacy; (2) whether society is willing to recognize that expectation as objectively reasonable; and (3) the nature of the State's intrusion. *Desserly v. Department of Corrections*, (Mont. Feb. 15, 2000), 2000 WL 193539, *4.

¶49 We believe Elison had an actual expectation of privacy in the items stowed behind his seat, and we believe his actual expectation of privacy was reasonable. Placing an object beyond the purview of the public in a place from which the person has the right to exclude others evidences an actual or subjective expectation of privacy. "What a person knowingly exposes to the public is not protected, but what an individual seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Bullock*, 272 Mont. at 375, 901 P.2d at 70.

¶50 Moreover, the State has provided us with no reason to believe Elison's actual expectation of privacy was unreasonable. Significantly, the Supreme Court decisions which have essentially done away with the exigent circumstances requirement of the "automobile exception" have done so, at least partially, on a theory of the reduced expectations of privacy of people operating automobiles. *See, e.g., Carney*, 471 U.S. at 391, 105 S. Ct. at 2069-70. In *Carney*, the Court observed that this reduced expectation of privacy derives from the "pervasive regulation of vehicles capable of traveling on the public highways." 471 U.S. at 392, 105 S. Ct. at 2069. In explanation, the Court stated:

> Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.

*Carney, 471 U.S. at 392, 105 S. Ct. at 2069-70.*

¶51 We do not find the Supreme Court's "reduced expectation of privacy" analysis compelling. We *do* believe that when a person rides in an automobile, that person accepts that their actions and any items left uncovered on the dashboard or on the seat are no longer private because of their public visibility. Even in Montana, when persons leave the privacy of their home and expose themselves and their effects to the public and its independent powers of perception, it is clear that they cannot expect to preserve the same degree of privacy for themselves or their affairs as they could expect at home. *State v. Scheetz* (1997), 286 Mont. 41, 49, 950 P.2d 722, 726. However, when a person takes precautions to place items behind or underneath seats, in trunks or glove boxes, or uses other methods of ensuring that those items may not be accessed and viewed without permission, there is no obvious reason to believe that any privacy interest with regard to those items has been surrendered simply because those items happen to be in an automobile. Furthermore, there is no reason to believe that the "pervasive and continuing governmental controls and regulations" of automobiles could serve to reduce someone's expectation of privacy in items so stowed. Although the State may have a legitimate interest in securing compliance with safety and traffic regulations, there is absolutely no logical connection between prohibitions such as driving with expired registration stickers or a noisy muffler, and the State's need to conduct a warrantless search behind the seat of an automobile. Visual inspections of license plates for expired tags do not entail searches

of glove boxes, trunks, and underneath seats. *See generally*, 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 7.2(b) at 470 (3d ed. 1996).

¶52 Lastly, we must also consider whether "the state's method of investigation is so personally invasive that we recognize the intrusion as a search that requires further justification, such as a warrant or other special circumstances." *Scheetz*, 286 Mont. at 50, 950 P.2d at 727. One concern motivating this consideration has been whether the State's method is overbroad in that it presents a "substantial threat of revealing unnecessary aspects of an individual's private affairs." *Scheetz*, 286 Mont. at 50, 950 P.2d at 727. A method of investigation which tends to reveal information regarding both legal and illegal behavior will require further justification in that it frustrates a person's legitimate expectation of privacy. *See Scheetz*, 286 Mont. at 50-51, 950 P.2d at 727. Unlike the drug-detecting canine sniff of luggage at issue in *Scheetz*, rummaging through a person's personal effects behind the seat of their automobile divulges everything stowed behind the seat and does not permit a person to "maintain as private everything except the contraband." *Scheetz*, 286 Mont. at 51, 950 P.2d at 727. This type of search is the classic example of a method of investigation which typically requires a warrant or other special circumstances. *See Bullock*, 272 Mont. at 384, 901 P.2d at 75-76.

¶53 Because an individual may have a reasonable privacy interest in items stowed in an automobile beyond the purview of the public and the State's method of investigation invades this legitimate interest, the State must have a compelling interest for doing so. Art. II, § 10, Mont. Const. A compelling state interest exists where the State enforces its criminal laws for the benefit and protection of other fundamental rights of its citizens. *Hulse*, ¶ 34. Montana has a compelling interest to remove drivers under the influence of alcohol or drugs from our roadways. *Hulse*, ¶ 34. *See also* § 61-8-401, MCA (prohibiting driving while under the influence of alcohol or drugs). Montana also has a compelling interest in eradicating the possession of unlawful intoxicants. *See generally*, Title 50, Chapter 32, MCA ("Controlled Substances"). Yet even with these compelling state interests, the State may not invade an individual's privacy unless the procedural safeguards attached to the right to be free from unreasonable searches and seizures are met. *Hulse*, ¶ 34.

¶54 Because of the legitimate privacy interests implicated and the invasive and generally overbroad nature of the state's intrusion on these interests, the search of an automobile requires more than merely the existence of probable cause to believe it contains evidence of a crime. On the foregoing basis, we conclude that, despite any language to the contrary

in our previous decisions, there is no "automobile exception" to the search warrant requirement under the Montana Constitution. Rather, as we have consistently held, a warrantless search of an automobile requires the existence of probable cause as well as a generally applicable exception to the warrant requirement such as a plain view search, a search incident to arrest, or exigent circumstances.[(3)](#)

¶55 The remaining issue is whether Officer Conrad's warrantless search was justified by both probable cause and an exception to the warrant requirement. As noted, the District Court concluded that Officer Conrad's search was justified because of exigency. The Court found the following exigent circumstances: the mobility of the vehicle, the possibility that a confederate could move the vehicle, and the fact that the stop was made at 12:05 a.m. and that it would have been difficult to obtain a search warrant at that hour. In regard to the last circumstance, the court took judicial notice of the fact that judges or magistrates are not reasonably available to obtain a search warrant at that time of night.

¶56 We have previously explained that exigent circumstances are those circumstances that would cause a reasonable person to believe that prompt action was necessary to prevent physical harm to police officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts. *State v. Wakeford*, 1998 MT 16, ¶ 24, 287 Mont. 220, ¶ 24, 953 P.2d 1065, ¶ 24. The State bears the heavy burden of showing the existence of exigent circumstances and can meet that burden only by demonstrating specific and articulable facts. *Wakeford*, ¶ 24.

¶57 The District Court's finding of exigent circumstances is clearly erroneous. First, as discussed above, the mobility of an automobile, without more, is not sufficient to justify a warrantless search. Second, the possibility that a confederate might move the vehicle could establish exigency by indicating the possibility that relevant evidence would be destroyed unless the police took prompt action. However, there is no evidence in the record to establish this possibility; Elison was alone and without means to contact a confederate. Third, the fact that the stop was made at 12:05 a.m. and that it would have been difficult to obtain a search warrant because of the availability of judges or magistrates at that time of night does not establish exigent circumstances justifying a warrantless search. Significantly, Officer Conrad made no effort to obtain a search warrant. Furthermore, while we understand that Montana's judges and magistrates would prefer not to be disturbed late into the night, Montana's constitutional protections do not simply fade away with the setting of the sun. The prohibition against unreasonable

searches safeguards people in Montana at all times. We cannot conclude that the validity of a warrantless search could turn solely on the time of day that search was conducted.

¶58 We conclude that the State did not bear its heavy burden of demonstrating the existence of specific and articulable facts indicating the necessity of searching Elison's vehicle without first obtaining a warrant. We further conclude, on independent state grounds pursuant to Article II, Sections 10 and 11 of the Montana Constitution, that the warrantless search of Elison's vehicle was unlawful and the District Court erred in denying Elison's motion to suppress the fruits of that search.

¶59 We reverse and remand for proceedings consistent with this decision.

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ KARLA M. GRAY

Justice W. William Leaphart, concurring in part and dissenting in part.

¶60 I concur with the Court's resolution of issues one and three. For the following reasons, I dissent as to issue number two.

¶61 The District Court concluded that Elison was not in custody when Officer Conrad asked him certain questions about marijuana and that *Miranda* therefore does not apply. The District Court concluded further that "[i]t was within Officer Conrad's discretion after he had a particularized suspicion to effectuate the traffic stop, to ask Defendant investigatory questions designed to identify him as a witness or a suspect in a reported crime."

¶62 Citing State v. Rushton (1994), 264 Mont. 248, 870 P.2d 1355, Elison argues that when a person is not free to leave because of the express or implied conduct of the police,

any interrogation is custodial in nature. In *Rushton*, the Court concluded that "[t]o determine if a custodial interrogation has occurred, this Court considers each case on a case-by-case basis and looks to whether a 'reasonable person' would not feel free to leave, after considering such factors as the time and place of interrogation, the length and mood of interrogation, and persons present during the questioning." *Rushton*, 264 Mont. at 256, 870 P.2d at 1360. Elison argues that he was "secured" at the back of his truck, that no reasonable person would have felt free to leave, and that the District Court found that Elison was not free to leave. Elison argues further that Officer Conrad's questions were not merely "investigatory" but went to "the heart of the offenses charged."

¶63 The State responds that Officer Conrad's questions were investigatory in nature and did not require a *Miranda* warning. Further, citing State v. Allen, 1998 MT 293, 295 Mont. 139, 970 P.2d 81, the State argues that investigative questions made during a temporary roadside detention need not be preceded by a *Miranda* warning even when a suspect is not free to leave. The State urges that the questions occurred during a "public, routine, and temporary" stop.

¶64 In *Allen*, defendant Allen was stopped by police because his vehicle lacked a front license plate. The police officer approached Allen and explained why he had stopped him. The officer came to suspect that Allen was improperly using a demonstrator plate and asked Allen to exit the car so that they could talk. As the officer explained the charges against Allen, the officer smelled alcohol on Allen's person and asked Allen whether he had been drinking. Allen admitted having two beers. The officer told Allen that he did not have the right to call his lawyer and had him perform sobriety tests, which he failed. The officer arrested Allen, brought him to the police station, and had him provide a breath sample that showed a BAC of 0.13. At that time Allen was advised of his rights under *Miranda*. Relying on Berkemer v. McCarty (1983), 468 U.S. 420, 104 S.Ct. 3138, 82 L. Ed.2d 317, the *Allen* Court concluded that "[t]he stop was still public, routine and temporary in nature [and that] [t]hose critical facts distinguish it from 'custodial' interrogations." *Allen*, ¶ 13.

¶65 In *Berkemer*, an Ohio highway patrol officer observed a car weaving in and out of traffic and stopped the car. The officer had Berkemer get out of the car, noticed that he had trouble standing, and asked him whether he had used intoxicants. Berkemer responded that he had recently drunk alcohol and smoked marijuana. Berkemer was arrested and taken to jail. However, at no time before Berkemer went to jail was he advised of his rights under *Miranda*. The *Berkemer* Court held that "a person subjected to custodial

interrogation is entitled to the benefit of the procedural safeguards enunciated in *Miranda*, regardless of the nature or severity of the offense of which he is suspected or for which he was arrested." *Berkemer*, 468 U.S. at 434, 104 S.Ct. at 3147, 82 L.Ed.2d at 331.

¶66 However, the *Berkemer* Court further held that the roadside questioning of a motorist detained pursuant to "a *routine* traffic stop" should not be considered custodial interrogation. *Berkemer*, 468 U.S. at 438, 441, 104 S.Ct. at 3149, 82 L.Ed.2d at 333-35 (emphasis added). The Court in *Berkemer* found that an ordinary traffic stop has two features that "mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.' " *Berkemer*, 468 U.S. at 437, 104 S.Ct. at 3149, 82 L. Ed.2d at 333. First, "detention of a motorist pursuant to a traffic stop is presumptively temporary and brief." *Berkemer*, 468 U.S. at 437, 104 S.Ct. at 3149, 82 L.Ed.2d at 333. The *Berkemer* Court contrasted questions during such a detention with stationhouse interrogations where "the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." *Berkemer*, 468 U.S. at 438, 104 S.Ct. at 3149, 82 L.Ed.2d at 333. Second, the *Berkemer* Court concluded that the "atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself." *Berkemer*, 468 U.S. at 438-39, 104 S.Ct. at 3149, 82 L.Ed.2d at 334. The Court concluded that most roadside stops are analogous to *Terry* stops. The *Berkemer* Court conceded, however, that "our adherence to the doctrine just recounted will mean that the police and lower courts will continue occasionally to have difficulty deciding exactly when a suspect has been taken into custody." *Berkemer*, 468 U.S. at 441, 104 S.Ct. at 3151, 82 L.Ed.2d at 335.

¶67 In the present case, the State's reliance on *Allen* and *Berkemer* is not persuasive. The State has not shown that Officer Conrad's stop of Elison was "routine." As the majority notes, Officer Conrad informed Elison of Gibson's observations and told him that he smelled marijuana. Further, Gibson's observations indicate that Elison realized that an occupant of a police car had seen him smoking marijuana. Thus, when Officer Conrad stopped Elison, Elison had no reasonable grounds to believe that his was a routine ordinary traffic stop of a presumptively temporary duration. Both Elison and Conrad knew full well that Elison was being stopped on suspicion of illegal drugs-not for a traffic violation.

¶68 *Berkemer* makes clear that in determining whether a person questioned will be induced "to speak where he would not otherwise do so freely," the nature of the stop is important. *Berkemer*, 468 U.S. at 437, 104 S.Ct. at 3149, 82 L.Ed.2d at 333. In other

words, is the stop "presumptively temporary and brief?" *Berkemer*, 468 U.S. at 437, 104 S. Ct. at 3149, 82 L.Ed.2d at 333. Both the officer and Elison knew that the stop was for suspected drug use. The stop was not a "traffic" stop, it was not "routine" and it was not going to be "presumptively temporary and brief." In my view, *Miranda* should apply under these facts. I would reverse on issue two.

/S/ W. WILLIAM LEAPHART

Justices William E. Hunt, Sr. and Terry N. Trieweiler, join in the foregoing concurring and dissenting opinion.

/S/ TERRY N. TRIEWEILER

/S/ WILLIAM E. HUNT, SR.

1. Elison does not contest the legality of Officer Conrad's frisk.

2. We note that the trained dog did not indicate the presence of drugs until after Officer Conrad had already entered the vehicle.

3. The District Court stated that under some of our previous decisions it is unclear whether Officer Conrad could have lawfully seized Elison's vehicle for a reasonable time until a search warrant could be obtained. In *State v. Broell* (1991), 249 Mont. 117, 814 P.2d 44, we stated that a "warrantless seizure" of a car falls under the "automobile exception" to the warrant requirement. 249 Mont. at 122, 814 P.2d at 47. However, we held that the seizure at issue in *Broell* was lawful regardless of exigent circumstances because "there was sufficient probable cause under the facts of this case to believe that illegal drugs were located in Broell's car." 249 Mont. at 123, 814 P.2d at 47. The legality of a warrantless seizure has not been raised and therefore is not currently before us.