Nos. 00-781 & 00-802

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 65

STATE OF MONTANA,

Plaintiff and Respondent,

v.

JESUS MARTINEZ and DANIEL OLSON,

Defendants and Appellants.

FILED

APR 01 2003

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:     District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, Cause Nos. DC 99-0859 & DC 99-863
The Honorable Russell C. Fagg, Judge presiding.

COUNSEL OF RECORD:

     For Appellants:

        Kristina Guest, Appellate Defender Office, Helena, Montana

     For Respondent:

        Mike McGrath, Montana Attorney General, Stephen C. Bullock, Assistant
Montana Attorney General, Helena, Montana; Dennis Paxinos, Yellowstone
County Attorney, Billings, Montana

Heard: October 2, 2001
Submitted: December 12, 2002
Decided: April 1, 2003

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Jesus Martinez and Daniel Olson pled guilty to felony drug offenses, while preserving the right to appeal the denial of separate motions to suppress evidence gathered as a result of an investigative stop of their vehicle. We reverse the order of the Thirteenth Judicial District Court, Yellowstone County, denying the Appellants' motions to suppress.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 The investigative stop of Jesus Martinez and Daniel Olson on the afternoon of November 4, 1999, culminated a two-week investigation by the Billings Police Department's Special Investigation Unit (SIU). The issue on appeal is whether the police officers had a particularized suspicion to justify the stop. Because a finding of particularized suspicion is fact-specific, we recount the events leading up to the stop in some detail.

¶3 On October 20, 1999, Detective Richard Hirschi received a call from a woman who stated a man named Ricky would arrive in Billings within three days with fifty pounds of marijuana. According to the woman, Ricky would travel from Oregon in a tan Thunderbird with license plate number WFY768 and stay at the Townhouse Motel. Later that day, Hirschi met the caller and signed her up as a confidential informant. The woman stated that she was the girlfriend of a man named Daniel Olson, who lived in Havre, Montana, and that her boyfriend knew about many illegal dealings.

¶4 Hirschi and Detective Ken Paharik followed up the tip by visiting the Townhouse Motel and determining that a Thunderbird with a similar plate number had been listed on the

2

motel register two weeks earlier by a guest named Jesus Martinez. Martinez had stayed at the Townhouse on October 1 and 2, 1999, and on October 12 through 14, 1999. The detectives ran a vehicle registration check and learned that the plate number provided by the informant was registered to Pedro Martinez Acezedo of Salem, Oregon, for a tan-colored 1989 Thunderbird. Upon questioning, Townhouse employees reported noticing no suspicious activity during Martinez's prior stays at the motel. The police requested that motel personnel contact them should Martinez check-in again.

¶5 On November 2, 1999, the motel clerk alerted Hirschi that Martinez had again registered and that he was driving a small 1986 Chevrolet truck with Oregon plates. The police verified the truck was registered to a Mario Rodriguez of Monmounth, Oregon. Later that day, the confidential informant called again and told Hirschi that Ricky had checked-in at the Townhouse. In addition, the informant related that Daniel Olson had stolen a flat-bed truck in Great Falls and driven it to Billings. She directed the police to a three-block area where the truck was parked in Billings. The detectives verified that a truck stolen in Great Falls the previous day was at the described location.

¶6 The police placed Martinez under surveillance shortly after his arrival in Billings and continued to follow his movements for most of the next two and one-half days. Throughout this time, the surveillance team observed no activity that they associated with drug-dealing. The officers saw no persons come to or leave Martinez's motel room; did not witness Martinez meeting with people in bars or restaurants, on the street or at other public places;

3

and never observed Martinez carrying large sacks or luggage to or from his vehicle.

¶7 During the second day of surveillance, the police pulled Martinez over for illegally changing lanes on a Billings street. After questioning him, the officers requested permission to search the vehicle. Martinez consented. Officer Lamb and the department's drug-sniffing dog "Tico" assisted in the search. A small bud, weighing approximately 0.4 gram and testing positive for THC, was found on the truck seat. Unable to establish that the marijuana belonged to Martinez, the police retained the evidence and allowed Martinez to leave without issuing a traffic ticket or complaint.

¶8 On November 4, 1999, the confidential informant again contacted Hirschi and told him that Martinez planned to leave Billings with Daniel Olson at about 1:00 p.m. that day to sell the remaining marijuana in Bozeman. She stated that Martinez probably would be driving a different vehicle. The police confirmed with a motel employee that Martinez was seen leaving the motel driving a teal Mazda pickup with a temporary registration sticker.

¶9 The SIU planned a stake-out along the route to Bozeman, and Sergeant Tim O'Connell requested permission to ride with the Montana Highway Patrol to execute the stop as soon as Martinez and Olson traveled past the Laurel exit on Interstate 90, a few miles west of Billings. When the Mazda pickup passed Highway Patrolman Craig Baum heading west at about 1:30 in the afternoon, Baum caught up with the vehicle and pulled it over. O'Connell and Baum approached the pickup from opposite sides. After a brief exchange, the officers directed Martinez and Olson to get out of the pickup.

4

¶10 Detectives Hirschi and Paharik arrived at the scene within two minutes of the stop and immediately handcuffed and separated Martinez and Olson. Paharik interviewed Martinez in one police vehicle; Hirschi questioned Olson in another. The detectives advised each defendant of his Miranda rights and informed each that he was not under arrest but was detained for investigation. Officers Evans and Lamb soon drove up and had "Tico" sniff the scene. The dog "signaled" positively for the presence of contraband in the pickup cab. Martinez refused to consent to a search, stating that he had borrowed the vehicle. The record contains no information on the duration of the separate interrogations of Martinez and Olson or whether the handcuffs were removed prior to questioning.

¶11 Martinez confessed to Paharik that a suitcase in the pickup contained "mota." The record does not reveal whether Paharik interviewed Martinez in Spanish or English. Paharik explained to the other officers at the scene that "mota" means marijuana. The police arrested Martinez and Olson and impounded the pickup. The detectives obtained a warrant to search the vehicle and found approximately 15 pounds of marijuana in a suitcase. Martinez and Olson were separately charged with felony possession and possession with the intent to sell dangerous drugs. Olson requested and received court-appointed counsel.

¶12 The defendants filed separate motions to suppress all evidence gathered as a result of the investigative stop on the grounds that the police lacked particularized suspicion of any wrongdoing to justify the stop. The State moved without objection to consolidate the defendants' motions for hearing, which occurred on April 14, 2000. The District Court

denied the motions on May 2, 2000.

¶13 Preserving their rights to appeal, Martinez pled guilty to criminal possession with intent to sell under § 45-9-303, MCA, and Olson to criminal possession under § 45-9-302, MCA. Martinez received a five-year suspended sentence and deferred fine. The District Court granted Martinez's request for court-appointed counsel to carry this appeal. Olson received a four-year suspended sentence and deferred fine on October 2, 2000. Both defendants filed timely appeals, which this Court thereafter consolidated.

¶14 After the initial briefing, this Court noted that all parties argued our decision in *State v. Pratt* (1997), 286 Mont. 156, 951 P.2d 37, as the legal basis underlying the particularized suspicion for the vehicle stop in this case. We directed the parties to assume, *arguendo*, that *Pratt* and its progeny are not appropriate authority for the vehicle stop on the facts presented and ordered supplemental briefing on whether the stop is or is not supportable based on other legal authority and argument.

¶15 Citing *Alabama v. White* (1990), 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, the State argues that particularized suspicion of criminal activity can arise from information that is less reliable than that required to show probable cause and that deficiencies in police corroboration of criminal behavior may be overcome by the strength of an informant's basis of knowledge. Moreover, the State points out that this Court recognized in *State v. Elison*, 2000 MT 288, ¶ 20, 302 Mont. 228, ¶ 20, 14 P.3d 456, ¶ 20, that when a tip is reliable, "corroboration of innocent behavior may be sufficient to raise a

6

particularized suspicion."

¶16    Martinez and Olson argue in their supplemental brief that the investigative stop of November 4, 1999, constituted a warrantless arrest. The Appellants analogize the circumstances of their stop to the facts depicted in *United States v. Beck* (9th Cir. 1979), 598 F.2d 497, where nine border police acting on a custom agent's uncorroborated hunch that three young men crossing the border from Mexico were importing illegal drugs, surrounded and stopped a taxi carrying the young men to the airport. The "suspects" were separated and questioned individually. The Ninth Circuit Court of Appeals held the investigative stop was actually an illegal arrest executed without probable cause or warrant. The Appellants similarly claim that their detention, handcuffing and interrogation in separate police vehicles exceeded the scope of an investigative stop and the police lacked probable cause for an arrest. [1]

¶17    The rule is well established that this Court will not address an issue raised for the first time on appeal. *State v. Peterson,* 2002 MT 65, ¶ 24, 309 Mont. 199, ¶ 24, 44 P.3d 499, ¶ 24 (citing *State v. Weaselboy,* 1999 MT 274, ¶ 16, 296 Mont. 503, ¶ 16, 989 P.2d 836, ¶ 16). A party may not raise new arguments or change its legal theory on appeal. *Unified Industries, Inc. v. Easley,* 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15

---

[1]    Appellants' argument that the stop in the instant case was actually an illegal arrest finds support in the recent drug interdiction case of *State v. Olson,* 2003 MT 61, ___Mont.___, ___P.3d___, where this Court held that the on-the-street questioning of a defendant during an investigative stop constituted a custodial interrogation requiring *Miranda* warnings against self-incrimination.

(where this Court declined to follow an exception to the rule when the facts are undisputed). The reason for the rule is that it is fundamentally unfair to fault the trial court for failing to rule on an issue it was never given the opportunity to consider.

¶18 The Appellants identified no exception to the above rule that would apply when they posited a wholly new legal theory of the case in their supplemental brief. Although facts in the record certainly raise genuine issues regarding the scope of the investigative stop, neither Martinez nor Olson questioned the scope before the District Court and neither argued at the suppression hearing, that the stop became an arrest without probable cause. Although this Court invited the parties to present additional argument and authority, we decline to address an issue raised for the first time by brief before this Court. Therefore, we limit our review to the issue raised by the Appellants in the District Court and the record made thereon, which is whether the District Court correctly concluded that particularized suspicion supported the investigative stop.

## STANDARD OF REVIEW

¶19 The standard of review of a district court's denial of a motion to suppress evidence is whether the court's findings are clearly erroneous. *State v. Carlson*, 2000 MT 320, ¶ 14, 302 Mont. 508, ¶ 14, 15 P.3d 893, ¶ 14 (citation omitted). To determine whether a finding of fact is clearly erroneous, this Court ascertains whether the finding is supported by substantial evidence, whether the district court misapprehended the effect of the evidence, and whether the Court is nevertheless left with a definite and firm conviction that the district

8

court made a mistake. *State v. Jarman*, 1998 MT 277, ¶ 8, 291 Mont. 391, ¶ 8, 967 P.2d 1099, ¶ 8 (citation omitted). We further review a district court's denial of a motion to suppress to determine whether the court's interpretation and application of the law are correct. *Hauge v. District Court*, 2001 MT 255, ¶ 11, 307 Mont. 195, ¶ 11, 36 P.3d 947, ¶ 11 (citations omitted). This Court's review is plenary as to whether the district court correctly interpreted and applied the law. *State v. Griggs*, 2001 MT 211, ¶ 17, 301 Mont. 366, ¶ 17, 34 P.3d 101, ¶ 17 (citation omitted).

## DISCUSSION

¶20 The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect persons against unreasonable searches and seizures. Whenever a police officer restrains a person's freedom, such as in a brief investigatory stop of a vehicle, the officer has seized that person. *State v. Reynolds* (1995), 272 Mont. 46, 49, 899 P.2d 540, 542 (citing *Terry v. Ohio* (1968), 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889, and *United States v. Cortez* (1981), 449 U.S. 411, 417, 101 S.Ct. 690, 694-95, 66 L.Ed.2d 621).

¶21 A "stop" is defined by statute as "the temporary detention of a person that results when a peace officer orders the person to remain in the peace officer's presence." Section 45-2-101(71), MCA. To justify an investigative stop, an officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. *Reynolds*, 272 Mont. at 49, 899 P.2d at 542 (citing *Terry*,

9

392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d 889).

¶22    In *State v. Gopher* (1981), 193 Mont. 189, 631 P.2d 293, we adopted the test announced in *Cortez* and held that in order for the State to prove the existence of particularized suspicion, the State must show:

> (1) objective data from which an experienced police officer can make certain inferences; and,

> (2) a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing or was a witness to criminal activity.

*Gopher*, 193 Mont. at 194, 631 P.2d at 296.   When the facts support a particularized suspicion of wrong-doing, a limited and reasonable investigative stop and search by the police are justified.  *Gopher*, 193 Mont. at 194, 631 P.2d at 296.  In 1991, the Montana Legislature codified the principles enunciated a decade earlier in *Gopher* that "stop and frisk" rules apply to persons in vehicles and that particularized suspicion for an investigative stop may be based upon objective data other than a police officer's personal observations of suspicious activity.  *See* Ch. 800, sec. 43, L. 1991.  The current statutory standard for an investigative stop reads:

> In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

Section 46-5-401, MCA.

¶23    Whether particularized suspicion supports an investigative stop is a question of fact

10

that is analyzed in the context of the totality of the circumstances. *Pratt*, 286 Mont. at 161, 951 P.2d at 40 (citing *Reynolds*, 272 Mont. at 49, 899 P.2d at 542). In evaluating the totality of the circumstances, a court should consider the quantity, or content, and quality, or degree of reliability, of the information available to the officer. *Pratt*, 286 at 161, 951 P.2d at 40 (citing *Alabama*, 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d 301).

¶24 The case before us on appeal presents the question of what constitutes objective data from which a law enforcement officer may reasonably infer that criminality is afoot to justify the temporary seizure of a person for investigative questioning. The District Court found substantial evidence to support two independent bases for particularized suspicion to justify the investigative stop of the vehicle occupied by Martinez and Olson on November 4, 1999. We discuss each separately.

*Temporary Window Sticker*

¶25 Patrolman Baum testified at the suppression hearing that the small size of the print on the temporary window sticker adhered to the upper left-hand corner of the rear window of the teal Mazda pickup precluded him from verifying the sticker's number and expiration date without pulling the vehicle over. Baum offered the District Court the following explanation:

> I stopped the vehicle based on what Sergeant O'Connell told me. Fact that I couldn't read the sticker, that was secondary to the stop, but once we stopped the vehicle, I walked up to the pickup and looked at the sticker. It appeared to be current.

Baum informed Martinez that he had stopped him because the pickup had no license plates, and reported that Martinez laughed and pointed to the temporary tag attached to the window

11

behind him.

¶26 Martinez and Olson argue that § 61-3-342(1), MCA, requires only that a valid temporary window sticker be properly displayed "on the upper left-hand corner of the rear window of a motor vehicle" and does not require that the sticker be easily readable at a distance. They claim that law enforcement had no reason to suspect that the pickup was not legally registered on the basis that the sticker numbers were difficult to discern and contend that sticker verification was a pretext for stopping them.

¶27 An investigative stop is a temporary detention that "may not last longer than is necessary to effectuate the purpose of the stop." Section 46-5-403, MCA. See also, *Terry*, 392 U.S. at 29, 88 S.Ct at 1883-84, 20 L.Ed.2d 889. All motor vehicles operated on the public highways of Montana must be properly registered with the State and have license plates conspicuously displayed on the front and rear ends of the vehicle. Section 61-3-301, MCA. New owners of transferred vehicles are afforded a grace period in which to complete vehicle registration. Section 61-3-342(1), MCA, allows an owner awaiting delivery of a certificate of ownership to operate the newly transferred vehicle on public roads as long as a temporary window sticker issued by a county treasurer is clearly and properly displayed. Failure to comply with motor vehicle registration requirements constitutes a misdemeanor under § 61-3-601, MCA, and peace officers of all jurisdictions of the State of Montana are charged with the mandatory duty of enforcing these provisions. Section 61-3-602, MCA.

¶28 In *State v. Henderson*, 1998 MT 233, 291 Mont. 77, 966 P.2d 137, we acknowledged

12

that the inability of a police officer to view a temporary vehicle purchase sticker behind a darkly tinted car window was sufficient to give rise to a particularized suspicion that the vehicle was not properly registered. *Henderson*, ¶ 16. While the light tinting of the rear window of the teal Mazda pickup presented minimal visual impairment, Patrolman Baum testified that he nevertheless was unable to see the sticker's numbers while driving behind the vehicle. According to the District Court, the absence of license plates and Baum's inability to read the sticker expiration date provided an objective basis for Baum to infer that the Mazda's temporary window sticker was not valid. The court found the investigative stop was justified because Baum's inference gave rise to a legitimate suspicion that the vehicle was not legally registered.

¶29 We conclude the District Court's finding is not clearly erroneous. However, a quick check of the properly displayed temporary sticker in the bright mid-day sun permitted Baum to verify the sticker as valid, pursuant to §§ 61-3-342(1) and 61-3-602, MCA. Although the officer's inability to read the temporary sticker justified a stop to check the sticker's validity, once that limited purpose of the stop had been accomplished, no further police intrusion was warranted, and the investigative stop related to drug possession was not justified thereby.

*Confidential Informant's Tip*

¶30 A tip from a confidential informant stating that Martinez and Olson were on their way to Bozeman on the afternoon of November 4, 1999, to market a substantial amount of marijuana provided a second rationale for an investigative stop, according to the District

13

Court. Using the criteria set forth in *Pratt* the court found the confidential informant's tip to be reliable and police verification of non-criminal details of the suspects' travel arrangements to provide sufficient corroboration.

¶31 This Court adopted a three-factor test in *Pratt* to evaluate the reliability of an informant's tip as a basis for particularized suspicion. *Pratt*, 286 Mont. at 165, 951 P.2d at 42-43. In that case, a convenience store clerk called the police dispatcher late at night, identified himself, and reported that a very drunk man had just driven away from the store. The clerk stated that the man staggered, lingered in front of the beer case and acted generally confused. He described the make, model, color, license number and direction the vehicle was traveling, which the dispatcher relayed to a patrol officer. As soon as the officer encountered the person and vehicle at the location described by the clerk, he conducted an investigative stop. Although the officer never observed any overt illegal acts or suspicious behavior, such as a traffic safety violation or erratic driving, we held that the officer had the requisite particularized suspicion to justify a stop to investigate the citizen's allegations that the driver was operating his vehicle under the influence of alcohol. *Pratt*, 286 Mont. at 166, 951 P.2d at 43.

¶32 In discussing the circumstances of the *Pratt* case, this Court acknowledged the useful role that citizen informants can play in law enforcement, but we also recognized the potential for abuse if the informant provides unreliable information. *Pratt*, 286 Mont. at 164, 951 P.2d at 42. To guard against such abuse, we adopted the following three-part analysis for

14

evaluating the reliability of an informant's tip:

> 1) Whether the citizen informant identifies himself to law enforcement and thus exposes himself to criminal and civil liability if the report is false.
>
> 2) Whether the report is based on the personal observations of the informant.
>
> 3) Whether the officer's own observations corroborated the informant's information.

*Pratt*, 286 Mont. at 165, 951 P.2d at 42-43 (citing *State v. Villegas-Varela* (Or. 1994), 887 P.2d 809, 810-11). We further explained that "[c]orroboration of the tip occurs when the officer either observes illegal activity or finds the person, the vehicle, and the vehicle's location substantially as described by the informant." *Pratt*, 286 Mont. at 165, 951 P.2d at 43.

¶33 The first *Pratt* factor addresses the informant's identity and relationship to law enforcement and assumes that the citizen informant who identifies himself to the police is likely to be telling the truth. The District Court found this element was satisfied when the confidential informant met in person with Detective Hirschi. We disagree.

¶34 This Court distinguishes the concerned citizen who reports a chance encounter with crime as a civic duty from the confidential informant who works with police by reporting on the illegal activities of others. *State v. Reesman*, 2000 MT 243, ¶ 32, 301 Mont. 408, ¶ 32, 10 P.3d 83, ¶ 32. The 911-caller in *Pratt* was a citizen informant, as were the informants in subsequent cases that have relied upon our holding in *Pratt*. *See, e.g., State v. Elison*, 2000 MT 288, 302 Mont. 228, 14 P.3d 456; *State v. Roberts*, 1999 MT 59, 293 Mont. 476, 977

15

P.2d 974; *State v. Lafferty*, 1998 MT 247, 291 Mont. 157, 967 P.2d 363. We have repeatedly stated that a citizen informant who is motivated by "good citizenship" and willing to disclose the circumstances by which the incriminating information became known is presumed to be telling the truth. *Reesman*, ¶ 34; *Sharp*, 217 Mont. at 46, 702 P.2d at 962; *State v. Kelly* (1983), 205 Mont. 417, 436, 668 P.2d 1032, 1043; *State v. Liestiko* (1978), 176 Mont. 434, 439, 578 P.2d 1611, 1614. The confidential informant, on the other hand, enjoys no such presumption of veracity. *Reesman*, ¶ 32.

¶35     According to Sergeant O'Connell's testimony, this was the SIU's first experience working with this particular informant, who is identified in the record only as CI # 99-1020. At the April 14, 2000 suppression hearing, Detective Hirschi stated that he was the only officer involved in the investigation to meet or speak with the informant. He testified that CI # 99-1020 "had been in trouble with the law before; that she had been sent to prison; and that her boyfriend had been informed [sic] of numerous illegal activities, and she wanted to do what she thought was right." The record contains no additional background information on the informant, no other explanation of her motives for contacting the police, and no information as to the source and circumstances under which she came by the information she conveyed to Detective Hirschi.

¶36     Under *Reesman*, CI # 99-1020 does not enjoy a presumption that she is trustworthy, even though she met with Detective Hirschi in person. Also, given the confidential manner by which the informant conveyed data to the police, it is unclear whether she exposed herself

16

to criminal and civil liability if her report proved false. Accordingly, the presumption that an identified citizen informant is telling the truth under the first *Pratt* factor simply does not embrace the confidential informant in this case.

¶37  Although the State and Appellants both argue *Pratt* as a basis for particularized suspicion, we hold that *Pratt* does not offer the correct framework for analyzing the facts of this case. The *Pratt* test is a narrowly drawn variant of the *Gopher* analysis and addresses the reliability of a citizen's tip in the context of a DUI investigative stop. Although we also applied the *Pratt* test to an investigative stop for drug possession in *State v. Elison,* the particular circumstances of that case paralleled a DUI stop. *Elison* involved a citizen informant who caught a glimpse of a driver smoking a brass pipe and reported to a police officer that the driver appeared startled and tried to hide the pipe from view. Finding the driver and vehicle as described by the citizen informant and independently observing suspiciously evasive driving behavior constituted the objective data from which the police officer inferred the presence of a stash in the vehicle, justifying the investigative stop. *Elison,* ¶ 22.

¶38  The *Pratt* line of cases recognizes that a detailed tip from a concerned citizen based on the informant's personal observations is sufficient to trigger police intervention. An investigative stop is a particularly effective tool for DUI investigations and to prevent highway tragedies. A brief face-to-face exchange between the driver and a trained officer often will  affirm or refute an informant's allegation of drunkenness. If an officer detects the

smell of alcohol on the driver's breath, blood-shot and glassy eyes or slurred speech, further investigation may be warranted, such as field sobriety testing. *See Hulse v. State,* 1998 MT 108, ¶ 40, 289 Mont. 1, ¶ 40, 961 P.2d 75, ¶ 40. In most cases, within minutes and with minimal intrusion, a trained officer will be able to discern whether probable cause exists for a DUI arrest or whether the inferences drawn from the tip were incorrect.

¶39 By contrast, a vehicular stop in a drug interdiction case is less likely to yield decisive evidence of either innocence or criminality. Officers might look for contraband in plain view, ask the driver to consent to a full search of the vehicle or hope a suspect offers a voluntary confession. The brief detainment and questioning permitted during an investigative stop might not materially advance an investigation for drug possession if no incriminating evidence is visible and no one consents to a search or confesses. In *Elison,* we held the officer exceeded the scope of an investigatory stop and conducted an illegal search when the officer reached behind the driver's seat for a concealed bag of marijuana. *Elison,* ¶ 58.

¶40 However, neither the scope of the investigative stop nor the legality of Martinez's confession are the subject of this appeal. The sole issue presented to this Court is whether the stop of the vehicle driven by Martinez and Olson on November 4, 1999, was supported by particularized suspicion. We reiterate that § 46-5-401, MCA, allows a peace officer to stop any person or vehicle observed in circumstances that create a particularized suspicion that the person has committed, is committing or is about to commit an offense. We hold that

18

the test outlined in *Gopher* is the appropriate framework within which the State must demonstrate the existence of particularized suspicion in this case. The essence of the *Gopher* test is that specific and articulable facts comprising the totality of the circumstances must give the police a particularized and objective basis for suspecting a person of criminal activity. *Reynolds*, 272 Mont. at 49-50, 800 P.2d at 542 (citing *Cortez*, 449 U.S. at 417-18, 101 S.Ct. at 694-95, 66 L.Ed.2d 621).

¶41 The Appellants rely upon our holding in *State v. Anderson* (1993), 258 Mont. 510, 853 P.2d 1245, for the proposition that information provided by a known, previously reliable informant is not sufficient as a basis for an investigative stop when the police do not know the source of the informant's knowledge and have not corroborated any suspicious activity through independent investigation. In *Anderson*, an informant telephoned the Lincoln County Sheriff's Department to tell them that Anderson and another individual were leaving Libby to go to Washington to pick up a quantity of marijuana and would be driving a blue Toyota pickup. The informant stated that the men would return later the same night. The police devised a stake out along the highway. When they caught sight of the described vehicle after it crossed the border into Montana, they verified that the license number was registered to Anderson, and conducted an investigative stop.

¶42 This Court held the stop in *Anderson* was illegal. *Anderson*, 258 Mont. at 516, 853 P.2d at 1249. We reasoned that the police must have objective data from which to draw inferences and make deductions that lead to a suspicion that an individual is involved in

19

criminal activity. *Anderson,* 258 Mont. at 514, 853 P.2d at 1248 (citing *Gopher,* 193 Mont. at 192, 631 P.2d at 295). Objective data may be based on "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers." *Anderson,* 258 Mont. at 514, 853 P.2d at 1248 (quoting *Cortez,* 449 U.S. at 418, 101 S.Ct. at 695, 66 L.Ed.2d 621). We held that an uncorroborated tip does not constitute objective data from which a trained officer can infer a particular individual is or has been engaged in wrongdoing. *Anderson,* 258 Mont. at 516, 853 P.2d at 1249.

¶43 We distinguished the circumstances of the informant's tip in *Anderson* from the tip discussed in *Adams v. Williams* (1972), 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612, where the United States Supreme Court held that crime information offered to the police by a known and previously reliable informant possessed sufficient indicia of reliability to justify a brief investigative stop. In *Anderson,* the police officers had no factual information about how the informant came to know about the alleged drug transport. We also distinguished the case from *State v. Sharp* (1985), 217 Mont. 40, 702 P.2d 959, where police observation of skid marks and erratic driving corroborated a citizen's tip regarding an allegedly intoxicated driver. In *Anderson,* none of the observations made by the police prior to the stop suggested illegal activity.

¶44 The State urges this Court to follow the reasoning of the United States Supreme Court in *Alabama v. White,* and affirm the legality of an investigative stop conducted on the basis

20

of information that is less reliable than that required to show probable cause. The *Alabama* Court stated the principle as follows:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama*, 496 U.S. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d 301.

¶45 In *Alabama*, police received an anonymous tip that a woman would soon be leaving a particular apartment with an attache case containing a small amount of cocaine. The informant described the woman's car and told the police that she would drive to a certain motel. The police immediately went to the named apartment building and saw a vehicle matching the caller's description. Shortly thereafter, a woman, who was carrying nothing in her hands, left the building and entered the described vehicle. The officers tailed as the woman drove about four miles along the most direct route to the named motel. A short distance from the motel, the officers conducted an investigative stop. White consented to a search of the vehicle and the interior of a brown attache case, which revealed a small amount of marijuana. After White was arrested, officers found three milligrams of cocaine in her purse.

¶46 The *Alabama* Court held that the anonymous tip, as corroborated by independent police work, exhibited sufficient indicia of reliability to provide reasonable suspicion to make the investigative stop. The Court noted that, standing alone, the tip provided nothing from

21

which one might conclude the caller was honest or the information reliable. However, the Court reasoned that police corroboration of significant aspects of the caller's information about Vanessa White and the caller's apparent ability to predict the direction of White's travel indicated the tipster had a special familiarity with White's affairs. On the basis that the officers observed White getting into the identified car and driving in a certain direction, the Court condoned the officers' inference that the anonymous informant was both truthful and personally knowledgeable about White's criminal activities and concluded that the tip justified an investigative stop.

¶47    We note, first, that the tip that initiated the investigation of Vanessa White was unreliable for the following reasons: the identity of the tipster was unknown; the informant's motivation for offering the tip was unknown; the basis for the informant's knowledge about White's movements was unknown; and the source of the tipster's information regarding the alleged drug possession was unknown. Second, police corroboration of the unreliable tip consisted entirely of innocent, non-criminal information. The officers observed a woman leave an apartment building, get into a described car and drive in a predicted direction.

¶48    This Court recognizes that the *quantum* of information regarding suspected criminal activity needed to justify an investigative stop is lower than that required for an arrest or a search based on probable cause. However, we do not agree with the *Alabama* Court that information of a lesser *quality* will support particularized suspicion. Regarding the use of informant tips in the context of an investigative stop, we stated in *Anderson*--although

22

concededly in *dicta*--that a "tip that has not been shown to be reliable or trustworthy for purposes of establishing probable cause to procure a search warrant is also unreliable for purposes of providing an officer with particularized suspicion." *Anderson*, 258 Mont. at 516, 853 P.2d at 1249.

¶49    For a tip to support a finding of probable cause, the police must know the identity of the informant; trust from experience or presumption that the informant is telling the truth; and discern that the informant's information about the alleged crime derives from the informant's personal observations. *Reesman*, ¶¶ 28-35. Similarly, when an officer receives an informant's report of criminal activity, the officer must evaluate the veracity, reliability and basis of knowledge of the informant in order to determine whether the report supports reasonable suspicion. For example, in *Pratt, Roberts* and *Lafferty*, the officers involved presumed that the tips about alleged intoxicated drivers were reliable because the 911-caller in each case was a concerned citizen who identified himself to the police and reported his personal observations of suspicious activity. The only corroboration needed for these reliable tips consisted of wholly innocent information--the location of the persons and vehicles in the places described. By contrast, as we stated in *Pratt*, where an informant's tip is anonymous and lacks any indication of the basis for the informant's opinion, the officer must corroborate the tip by observing suspicious behavior that alerts the officer to the existence of a possible violation. *Pratt*, 286 Mont. at 168, 951 P.2d at 44; accord *Lafferty*, ¶ 12 (holding that any anonymous informant's report of criminal conduct that did not state the basis for the

23

informant's belief must be corroborated by an officer's personal observation of illegal or suspicious activity).

¶50 While corroboration of a tip with innocent information may lend an unknown or untested tipster some credibility, such indicia of reliability does not obviate the relevance of the tipster's basis of knowledge as a factor in the evaluation. In *Anderson*, although a previously reliable informant called in the tip, the officers were not aware of how the informant came by the reported information. As we discussed at length in *Reesman*, when a tip is based on hearsay or when an officer is uncertain about the informant's basis of knowledge, the tip cannot be considered reliable without independent corroboration of the criminality alleged. *Reesman*, ¶¶ 44-45. In the context of particularized suspicion, because the quantum of suspicion is less, an unreliable tip requires corroboration that supports an inference that criminality is afoot by direct police observation of suspicious activity and consideration of the modes of patterns of operation of certain kinds of lawbreakers. *Gopher*, 193 Mont. at 192, 631 P.2d at 295 (citing *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695, 66 L.Ed.2d 621).

¶51 Therefore, we decline to adopt the *Alabama* Court's reasoning that the veracity, reliability and basis of knowledge of an anonymous or otherwise unreliable informant may be inferred when police corroborate wholly innocent facts about the alleged criminal actor and no independent information indicates that the suspect is involved in the alleged crime or even that a crime has occurred or is occurring. As long as we guarantee the minimum rights

24

established by the United States Constitution, we are not compelled to march lock-step with pronouncements of the United States Supreme Court if our own constitutional provisions call for more individual rights protection than that guaranteed by the United States Constitution. *State v. Sierra* (1985), 214 Mont. 472, 476, 692 P.2d 1273, 1276 (overruled in part on other grounds by *State v. Pastos* (1994), 269 Mont. 43, 887 P.2d 199). This Court has repeatedly held that the unique language of Article II, Section 10 of the Montana Constitution, which establishes privacy as a fundamental right, affords greater protections than the Fourth Amendment in cases involving searches of persons or property. *State v. Hardaway*, 2001 MT 252, ¶ 31, 307 Mont. 139, ¶ 31, 36 P.3d 900, ¶ 31 (right to privacy disallows swabbing blood sample from hands of an arrestee as a warrantless search incident to lawful arrest); *Elison*, ¶ 46 (right to privacy disallows federal "automobile exception" to the warrant requirement in Montana); *State v. Nelson* (1997) 283 Mont. 231, 241-42, 941 P.2d 441, 448 (right to privacy disallows unauthorized access to personal medical records without subpoena); *State v. Bullock* (1995), 272 Mont. 361, 383, 901 P.2d 61, 75 (right to privacy disallows federal "open fields" search as an exception to warrant requirement).

¶52 Article II, Section 10 of Montana's Constitution provides:

> **Right of privacy.** The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

The heightened protection of individual privacy in Montana demands our divergence from federal jurisprudence regarding the use of tips as the basis for particularized suspicion

25

justifying the temporary seizure of a person for questioning. We hold that an allegation of criminality from an unreliable informant that has no known basis in fact does not constitute objective data from which an officer may legitimately infer particularized suspicion. Even though an investigative stop is conceived to be a brief governmental intrusion, if an unreliable tip provides the only grounds for the detention, the stop constitutes an unconstitutional infringement of an individual's right to privacy.

¶53 Martinez and Olson argue that the information provided by the confidential informant was not a reliable basis for particularized suspicion. They contend that the informant's past criminal record and prison history do not support her credibility and that the police knew little about how she came by her information. The nature of the informant's relationship with Daniel Olson was ambiguous and no testimony was taken on the subject. The Appellants correctly point out that no criminal charges resulted from the stolen truck incident or the search of Martinez's vehicle and argue that neither tip actually connected the Appellants to criminal activity. The Appellants further assert that the SIU did not observe any illegal or even suspicious activity indicating that Martinez was involved in drug dealing during the entire investigation, even after placing Martinez under surveillance for two and one-half days.

¶54 Deducing that CI # 99-1020's role as Olson's girlfriend allowed her to be "privy to conversations between Martinez and Olson," the District Court found that the informant "advised the detectives of the plans for the illegal activities that occurred when she was

26

present." On the basis of this inference, the court determined that the informant's report was based upon her personal observations of criminal activity. The Appellants counter that the informant never observed Martinez or Olson in possession of marijuana; she did not witness any drug transactions; and the District Court erred in finding that the informant's tip was based on her personal observations.

¶55 In *Reesman*, we held that a confidential informant's unverified report is reliable for the purpose of independently establishing probable cause--and, by incorporation, particularized suspicion--only after the informant has established a track record of providing the police with consistently accurate information and only when the police know that the informant's knowledge of the reported criminal activity is based upon personal observation. *Reesman*, ¶ 32 (citing *Kaluza*, 272 Mont. at 410, 901 P.2d at 111, and *State v. Walston* (1989), 236 Mont. 218, 223, 768 P.2d 1387, 1390).

¶56 As discussed above, because this case provided the SIU with their first experience in working with CI # 99-1020, the confidential informant had not established a track record that supports a finding of reliability. Regarding the confidential informant's source of knowledge, Detective Hirschi offered the following testimony on cross-examination at the suppression hearing,:

> Q. At any time, Detective Hirschi, did this informant tell you she had seen, with her own eyes, the marijuana?
>
> A. I don't think so.
>
> Q. In fact, she doesn't describe any transactions in regard to marijuana by

Jesus Martinez or Mr. Olson, does she?

A. No.

¶57 The record does not support the District Court's finding that the confidential informant personally observed the criminal behavior that she reported to the police. Neither Detective Hirschi nor any other officer involved in the investigation testified that CI #99-1020 listened in on discussions of the Appellants' "plans for the illegal activities." In fact, there was no evidence presented at the suppression hearing indicating that the SIU officers even asked the informant how she came by her incriminating information. Because Detective Hirschi testified that the informant did not personally observe any contraband substances or drug dealing and, as in *Anderson*, the record reveals nothing about the source of the informant's knowledge, we conclude that the court erred by finding the confidential informant's tip to be reliable. Consequently, the tip does not stand as an independent basis for the investigative stop.

¶58 When an informant's source of information is hearsay, independent police corroboration of "suspicious" activity is needed. *Reesman*, ¶ 29. We stated the principle in *Griggs* as follows:

> [T]he necessary indicia of suspicion that results from police corroboration of otherwise innocent information must reveal a pattern of human behavior associated with the alleged criminal activity, or activities which, when viewed as a whole, are consistent with the alleged criminal activity.

*Griggs*, ¶ 46.

¶59 The District Court found that the SIU officer's own observations corroborated the

confidential informant's information. The police confirmed the informant's report of the make and model of the vehicles Martinez drove; accurate license plate numbers; that Martinez traveled from Oregon; and that Martinez stayed at the Townhouse Motel during two prior visits to Billings. The informant told Detective Hirschi that Martinez would return to Billings in late October and the police verified Martinez arrived in Billings on November 2, 1999. She predicted that Martinez would again stay at the Townhouse Motel, which he did. The informant alerted Hirschi that Martinez would switch vehicles after the police searched his truck. The Townhouse Motel manager confirmed the vehicle change. The tracking of Martinez and Olson on November 4, corroborated that the Appellants set out on a road trip in a teal Mazda pickup with a temporary sticker, as described by the motel manager. The officers followed the vehicle through Billings traffic and waited until Martinez and Olson had driven past the Laurel exit on Interstate 90, headed in the direction of Bozeman. Sergeant O'Connell testified that when the vehicle passed the Laurel exit, he inferred the pickup was going to Bozeman.

¶60 The State also argues on appeal that the SIU found certain aspects of Martinez's transportation history indicated a pattern of criminal behavior. For example, Martinez had made two prior trips from Oregon to Billings within the previous month, which suggested to the officers the possibility of a drug trafficker servicing established customers. Although the police observed no suspicious behavior to associate Martinez with drug dealing during the two and one-half days of surveillance, the consensual search of the borrowed vehicle

29

Martinez was driving revealed a marijuana bud. The State contends that the discovery of a small amount of contraband associated Martinez with the illegal substance that the confidential informant reported him to possess in larger quantity, even though questions about the ownership of the marijuana bud precluded criminal charges. However, no police officers at the suppression hearing actually testified that their surveillance of Martinez and finding the 0.4 gram of marijuana lead them to this conclusion.

¶61 Martinez and Olson point out that their travel arrangements were equally consistent with innocent behavior and that none of the corroborative data cited by the State indicated patterned criminal behavior. We agree.

¶62 Motel employees reported that Martinez engaged in no suspicious activity during his prior stays at the motel. When Martinez returned to Billings, the SIU detectives surveilled him for two and one-half days and again observed no behavior associated with drug dealing or any other criminal activity. When the police stopped Martinez's vehicle on the second day of surveillance on a minor traffic charge, they searched his vehicle with his consent and with the assistance of a drug-sniffing dog. They could not establish that the minuscule marijuana bud found in the vehicle belonged to Martinez and, as a result, they let him go without any charges being filed--not even the traffic charge. The informant's tip that a flatbed truck was stolen in Great Falls and parked in Billings was never associated with Olson beyond the informant's allegation. Sergeant O'Connell's testimony that he inferred that Martinez and Olson were headed to Bozeman after they passed the Laurel exit on the Interstate does

30

nothing to verify the destination or the purpose of the Appellants' journey, especially given the fact that Bozeman is located over 120 miles from Laurel. In short, the particularized suspicion supporting the stop in this case was based on a totality of innocent conduct and allegations of marijuana possession from an unreliable informant. While innocuous conduct may be used in the calculus of the totality of the circumstances, that totality must lead to a suspicion of criminal conduct to justify an investigative stop. That did not occur here, and, importantly, no police officer testified that it did. Consequently, we hold that the stop of the vehicle was not legal for the purpose of obtaining an account of the Appellants' presence on the highway on the afternoon of November 4, 1999.

¶63    Justice Cotter argues in her dissenting Opinion that the confidential informant's report contained enough detail to establish that it was not fabricated from whole cloth and that the officers were correct to infer that her report was based on her personal observations. But how could the officers in this case legitimately *infer* that the informant personally observed a crime when the officers *knew* from the informant herself that she never saw the alleged marijuana or witnessed any drug transactions?

¶64    In his dissent, Justice Rice contends that the informant is presumptively trustworthy as a "concerned citizen " because she revealed her identity to the police and "wanted to do what she thought was right." We find no factual support for this where the record depicts a convicted felon with a prison history, protected identity, unclear motives and uncertain liability for falsely reporting. CI # 99-1020's present relationship with the police as a

31

confidential informant who reports on the activities of persons with whom she associates distinguishes her from the concerned citizen who reports a chance encounter with crime. Justice Rice further argues that the informant established a track record of reliability by calling the police a number of times during the investigation with additional pieces of accurate information. Pointing particularly to the tip about the truck allegedly stolen by Olson, the dissent contends that police verification of the vehicle's stolen status established the informant's trustworthiness. However, more than an ultimately proven allegation of theft--without any proven tie between the theft and the alleged thief--is needed to create a track record. Nothing in the record corroborated a connection between Olson and the stolen truck.

¶65 It is understandable that the dissent makes a great deal of the informant's various reports to the police as providing the basis for her reliability. That is all there is--a number of reports. The problem with this reasoning, however, is that the informant did not once report any activity that any officer ever testified was suspicious. Reduced to its essentials the informant reported at different times that the defendants were driving different vehicles. The officers dutifully followed the defendants around Billings for two and one-half days based on the informant's reports, yet observed no criminal activity--except the minor traffic offense for which no citation was issued. Not one officer ever testified that he observed any suspicious activity on the part of the defendants.

¶66 Justice Rice states that the confidential informant derived her information from being

in "strategic proximity to the planning of criminal activity" with the result that her information, thus, was based on "personal observation." Again, the record does not support this depiction. In fact, the record is absolutely devoid of any indication as to how the informant obtained her information. And, as we have already noted, that is the problem. There is no testimony in the transcript of the suppression hearing that the confidential informant overheard conversations planning any crime. In fact, there is no evidence in the record whatsoever as to how, when or under what circumstances the informant came by her information.

¶67 Indeed, the testimony on record is that the informant never actually saw any marijuana nor did she ever observe, much less describe, any transactions with regard to marijuana between either Martinez or Olson. The record is clear on this point. If the informant had a basis for her reports, we will never know because no one--neither the police nor the prosecution--ever bothered to ask her. Or, if they did, that evidence never made it into the record of the suppression hearing.

¶68 The dissent takes six reports of perfectly innocent conduct regarding Appellants--the driving different vehicles around town; undisputed police testimony that they never observed the Appellants engage in any suspicious, much less criminal, conduct, despite two and one-half days of surveillance; and a record totally devoid of any evidentiary basis for the informant's statements that the Appellants were engaged in transporting marijuana--and then transforms all of this into a conclusion that a reliable citizen informant has repeatedly

33

reported personal observations of a crime and that her reports are repeatedly corroborated.

¶69 While Justice Rice finds it "troubling" that more is not made of the 0.4 gram marijuana bud found on the seat of Martinez's vehicle, we can only note that the investigating officers did not put any significance on their discovery either. No officer testified at the suppression hearing that the bud was "highly relevant in confirming the informant's report that Martinez was transporting larger quantities of marijuana" as claimed by the dissent. The dissent would find the bud confirms the suspicions aroused by the confidential informant's unreliable tip and characterizes the majority's reliance upon the testimony of the investigating officers regarding the significance of the marijuana bud as "extreme hair splitting." Again, if the officers put as much weight on the marijuana bud "from a stem" and "not ground up" as does the dissent, we will never know, as there is not one iota of testimony in the record to that effect. The totality of the circumstances is the standard for assessing the inferences drawn by experienced police officers and the fact that the officers placed no importance on Martinez's unsubstantiated association with a marijuana bud is relevant to our inquiry on appeal.

¶70 Contrary to the dissent, we are not adopting any new rules nor are we changing those already adopted. The totality of the circumstances test is applicable. What the dissent fails to acknowledge is that the totality cannot be greater than the sum of its parts. No evidentiary underpinning for the informant's reports, or her reliability, two and one-half days of observed innocent conduct, no suspicious activity and no criminal conduct, still adds up to zero, no

34

matter how you finesse the numbers.

¶71 Justice Rice accuses the majority of "deftly prun[ing], snipp[ing] and trimm[ing] pieces of the police investigation." Quite to the contrary, the majority Opinion is grounded in the evidence adduced at the suppression hearing--or more correctly, in the lack of evidence. It is, rather, the dissent which takes liberties with the record. Indeed, the dissent creates evidence that is not there.

¶72 Finally, we note that the drug stop and interdiction in *State v. Olson*, 2003 MT 61, ___ Mont. ___, ___ P.3d ___, presents an informative contrast to the one at bar. In *Olson*, a person who was unquestionably acting as a citizen informant reported to the police his personal observations of an operational methamphetamine lab in the garage of his ex-wife when he entered the garage to retrieve two camper jacks. The informant immediately reported his observations to Great Falls authorities. *Olson*, ¶ 6. While they did not need to corroborate this presumptively reliable report (see *Reesman*, ¶ 34), the two investigating detectives went the extra mile and placed the garage under surveillance. Within an hour after their surveillance began, the detectives personally observed garbage bags being transferred from the garage into a vehicle and then the vehicle leaving the property driven by the defendant and accompanied by other individuals. *Olson*, ¶¶ 7, 28. Armed with this information--information which included presumptively reliable observations of criminal activity and corroborating observations of activity that, while innocent, nonetheless evidenced a pattern of activity consistent with criminal conduct (see *Griggs*, ¶¶ 46-50), the

35

detectives executed a successful investigative stop, *Olson*, ¶¶ 35-36, and obtained a search warrant that withstood the defendant's motion to suppress. *Olson*, ¶ 29.

¶73 Perhaps if the prosecution here had made for itself as good a case as does Justice Rice the result would be different. The majority shares the State's and Justice Rice's concerns for law and order and public safety, but the fact remains: it is not our function to make a case for either the State or the defendants. Our sole obligation is to apply the law in the context of the constitutional protections afforded to those accused.

## CONCLUSION

¶74 When the police decided to stop Martinez's vehicle on the Interstate as he and Olson were leaving Billings, neither had committed any traffic offense nor violated any other criminal law of which the police were aware. Ostensibly the stop was made to check the temporary sticker, but when the police approached, they could readily see that the sticker was current and correctly displayed. The grounds for the stop ended when that limited purpose was fulfilled outside the vehicle and that, thereafter, no further police intrusion was warranted under § 46-5-403, MCA, and under the rationale of our decision in *State v. Henderson*. Therefore, we hold that the District Court erred when it denied the Appellants' motion to suppress all evidence gathered as a result of the interrogation subsequent to the stop. Reversed and remanded for further proceedings consistent with this Opinion.

_____
                        Justice

36

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

37

Justice Jim Rice dissenting.

¶75 I dissent from the Court's reversal of the District Court. I disagree strongly with the Court's conclusion that "the particularized suspicion supporting the stop in this case was based on a totality of innocent conduct" and information from "an unreliable informant." *See* ¶ 62. The record and standards enunciated by this Court, including those adopted herein regarding the reliability of an informant in the context of particularized suspicion, compel the opposite result.

¶76 Although I do not dissent from the Court's application of our informant reliability standards to stops which are premised upon particularized suspicion, the Court's rejection of the reasoning of the United States Supreme Court in *Alabama v. White* (1990), 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301, is of little consequence under the facts here. The Court criticizes *Alabama*'s holding that "the veracity, reliability and basis of knowledge of an anonymous or otherwise unreliable informant may be inferred when police corroborate wholly innocent facts about the alleged criminal actor and no independent information indicates that the suspect is involved in an alleged crime." *See* ¶ 51. However, as discussed below, the two fundamental conclusions which undergird the Court's decision here, and its distinguishment of *Alabama*, those being (1) the informant was unreliable, and (2) the officers' corroboration of the informant's information was insufficient, are both faulty. I find the second conclusion to be profoundly so. The informant in this case was neither anonymous nor otherwise unreliable. Further, the police's corroboration was not limited to

38

wholly innocent facts without independent information that the defendants were involved in a crime. Thus, regardless of the necessity of corroboration, the police corroboration here was more than sufficient to support the investigative stop.

¶77 It cannot be overemphasized that this is a case involving particularized suspicion, and not probable cause. Because this was an investigative stop, our law requires only that there be "objective data from which an experienced officer can make certain inferences" and a "resulting suspicion" that criminal activity is afoot. *State v. Gopher* (1981), 193 Mont. 189, 194, 631 P.2d 293, 296. The Court here is requiring much more. The conclusions of the Court are discussed in turn.

## RELIABILITY OF THE INFORMANT

¶78 *Informant's status*. In ¶ 33, the Court repeats our long-established rule that "a citizen informant who is motivated by 'good citizenship' and willing to disclose the circumstances by which the incriminating information became known is presumed to be telling the truth," but then tosses the rule away and concludes that the informant here is not entitled to a presumption of trustworthiness.

¶79 The informant meets our criteria, above-stated, for a "good citizen" informant. "[I]f the informant is motivated by 'good citizenship' and the information provided demonstrates a sufficient degree of the nature of the circumstances under which the incriminating information became known, then the informant's disclosures are deemed a reliable basis . . . ." *State v. Reesman*, 2000 MT 243, ¶ 34, 301 Mont. 408, ¶ 34, 10 P.3d 83, ¶ 34. The

39

informant here was not anonymous, but identified herself, disclosed her phone and address information, revealed that she was a girlfriend to a defendant, relayed a substantial amount of information to police, and personally appeared at police offices to do so. Why did she do this? The evidence in regard to her motivation was that "she wanted to do what she thought was right." The defense offered no alternative motivations for her conduct. Further, it was obvious from the wide range of details she provided, which were corroborated by police, that her involvement as a girlfriend to a defendant had indeed given her access to the defendants' plans. Given this record, the Court has no basis to conclude that the informant was acting for any reason but good citizenship. As such, she should be considered reliable, yet the Court concludes that "[w]e find no factual support" for the hearing testimony that the informant was doing what she thought was right. Why does the Court deem the hearing testimony of the informant's good motive to be without "factual support"? Because the Court does not like the informant's background.

¶80 Instead of acknowledging that the requirements of *Reesman* were fulfilled here, the Court holds that the informant here cannot be considered a good citizen because she is "a convicted felon" and has "a prison history . . . unclear motives [or] uncertain liability for falsely reporting." *See* ¶ 64. Never have we held that informants with a criminal background could not be motivated by good citizenship, but the Court does so here. Apparently, unless the informant has a "lily white" background, she need not call, as this Court will deem her dark past to outweigh her desire to do good. The error here is painfully obvious, and cannot

40

be denied, as the Court has given no other reason to conclude that the hearing testimony of the informant's good motive cannot be believed, and there is no other reason from the record to so conclude.

¶81 *The informant's "track record."* The Court also finds that because this was the police's "first experience" in working with the informant, "the confidential informant had not established a track record that supports a finding of reliability," pursuant to *Reesman*. In mechanically applying our informant reliability standards, the Court misses the big picture here. The absence of a "track record" is an appropriate consideration when an informant makes a first call to police about suspected criminal activity. However, that is not the situation here.

¶82 Prior to the informant's call about the Bozeman trip which led to the stop, she made multiple other calls over a several week period about different activities, including other crimes, which were investigated by police and found to be accurate. The Court references some of the information derived from those previous calls, and the corroboration thereof.[1] Notable among those calls was the informant's report that Olson had stolen a truck from Great Falls, which police located in the area described by the informant and confirmed had been stolen. These calls represent successful police experiences with this informant, and undermines the Court's finding that this information suffered "indeterminable reliability." Indeed, the reliability was established when the information was confirmed by police.

---

[1] In its discussion in these referenced paragraphs, the Court overlooked other critical information provided by the informant, which is discussed below.

41

Neither does the State's failure to file charges on all of these reports serve to diminish the validity of the information provided. Quite to the contrary, each of the many calls made by the informant served to create a track record and enhance her credibility. By the time the informant informed police about the defendants' trip to transport drugs to Bozeman, the informant was far beyond a "first experience," and should have been considered reliable on this basis as well.

¶83 In response, the Court rejects this dissent's reliance on the informant's multiple accurate reports by asserting that police verification of the informant's stolen vehicle report did nothing to enhance her trustworthiness, and by dismissing her successive reports of the defendants' activities as "perfectly innocent conduct." The Court fails to explain how an accurate and corroborated report about a stolen vehicle would not serve to enhance an informant's credibility. Further, as discussed herein, the informant's other reports provided information that was much more than "perfectly innocent."

¶84 The informant here provided no less than six reports to police over a several week time period which were all corroborated, and I would conclude that the last report, in response to which police initiated the stop, was based upon a successful track record.

¶85 *Informant's personal observations.* The Court finds that because "the informant did not personally observe any contraband substances or drug dealing and . . . the record reveals nothing about the source of the informant's knowledge, . . . the court erred by finding the

42

confidential informant's tip to be reliable." ¶ 57. However, this is not the proper test for assessing an informant's personal involvement.

¶86 First, we analyze particularized suspicion in the context of "the totality of the circumstances." *State v. Reynolds* (1995), 272 Mont. 46, 49, 899 P.2d 540, 542; *United States v. Cortez* (1981), 449 U.S. 411, 417-18, 101 S.Ct. 690, 694-95, 66 L.Ed.2d 621, 628-29. Within that context, we ascertain an informant's personal involvement as follows:

> An officer may infer that the information is based on the informant's personal observations if the information contains sufficient detail that
>
> "it is apparent that the informant had not been fabricating [the] report out of whole cloth . . . [and] the report [is] of the sort which in common experience may be recognized as having been obtained in a reliable way . . . ."

*State v. Pratt* (1997), 286 Mont. 156, 165, 951 P.2d 37, 42-43, quoting *State v. Villegas-Varela* (Or. 1994), 887 P.2d 809, 811 (quoting *Spinelli v. United States* (1969), 393 U.S. 410, 417-18, 89 S.Ct. 584, 589-90, 21 L.Ed.2d 637, 644). The circumstances here establish without question that the informant was not fabricating her reports from "whole cloth," but rather, that she was in strategic proximity to the planning of the criminal activity. Therefore, we should conclude that the officer properly inferred that the substantial information provided by this informant was based upon her personal observation. The Court criticizes this dissent's conclusion that police could infer that the informant's reports were based upon personal observation, but it wholly fails to deal with the fact that our case law in regard to particularized suspicion allows for exactly that.

43

¶87 For these multiple reasons, the informant should be considered a good citizen and should be deemed to have previously provided accurate information. Corroboration should not be necessary. However, the officers nonetheless obtained it.

**POLICE CORROBORATION OF THE INFORMANT'S INFORMATION**

¶88 The Court improperly focuses its discussion on what the police did *not* observe. *See* ¶¶ 6, 53, 57. The proper focus is what police *did* observe, and whether "an experienced police officer can make certain inferences" therefrom. *Gopher*, 193 Mont. at 194, 631 P.2d at 296.

¶89 *The marijuana bud.* In a conclusion which I find very troubling, the Court concludes that the bud obtained by police in the first stop of defendant Martinez bears no relevance whatsoever to the question of particularized suspicion of drug trafficking. The Court acknowledges the State's argument that the bud was indicative of possession of a larger quantity of marijuana, but concludes that, because police "could not establish that the minuscule marijuana bud found in the vehicle belonged to Martinez and, as a result, they let him go without any charges being filed–not even the traffic charge," the bud did not indicate "patterned criminal behavior," and thus, cannot be considered.

¶90 Contrary to the Court's analysis, the relevance of the bud is not limited by the failure to establish Martinez' ownership of it, or the failure to charge him with its possession. As noted, the bud was highly relevant in confirming the informant's report that Martinez was transporting larger quantities of marijuana in his vehicle, an inference that would be

particularly significant in the eyes of "an experienced police officer," which our analysis is supposed to consider. The failure to charge Martinez with possession of the bud is nothing more than a "red herring" issue, and the Court should not consider it. Curiously, the Court is fixated on the police's failure to charge the defendants for violations observed prior to the stop at issue here. That the police elected not to further investigate or charge the defendants with theft of the truck or with possession of the bud could very well have reflected police interest in furthering their investigation of the reported transport of a large amount of drugs, but, whatever the reason, takes nothing away from the significance of this evidence in relationship to particularized suspicion. This one small piece of evidence, with its large attendant meaning in regard to drug trafficking, should require a different result here.

¶91 The Court attempts to dismiss the seizure of the marijuana bud because "the investigating officers did not put any significance on their discovery." The Court ignores that the officers testified that the bud appeared to come from a stem, and that it was not ground up marijuana, but, in any event, that testimony apparently does not satisfy the Court. The Court will not be deterred, suppressing this evidence because "[n]o officer testified at the suppression hearing that the bud was 'highly relevant.'"

¶92 In so holding, the Court misses the point of the entire case. This case was about stopping a suspected drug trafficker who was reported to be transporting a large amount of marijuana. Yet, because the officers didn't specifically testify that "we think this marijuana bud came from a bigger pile of marijuana," the Court finds that the bud offers no significance

45

as objective data for purposes of particularized suspicion. This conclusion is nothing more than extreme hair splitting and is irreconcilable with the requirement that we analyze particularized suspicion in the context of the "totality of the circumstances." *Reynolds*, 272 Mont. at 49, 899 P.2d at 542; *Cortez*, 449 U.S. at 417-18, 101 S.Ct. at 694-95, 66 L.Ed.2d at 628-29.

¶93 ***Switching of vehicles/future plans.*** The Court overlooks critical facts in its analysis of the informant's reliability, the police's corroboration efforts, and ultimately, the determination of particularized suspicion: the conspirators' switching of vehicles, and the predictive nature of the defendants' plans. Following the police stop and the discovery of the bud in the Chevrolet pickup driven by Martinez on November 3, the informant told police that the defendants were leaving Billings the next day, and that because of the police stop, they had switched vehicles and were going to drive a teal-colored Mazda truck with a temporary sticker. The switch in vehicles was confirmed by independent police surveillance. About this information, the State offers in its brief:

> The reliability of the information and its use as the basis for the detectives' particularized suspicion is buttressed not only by the detail she provided, but also relating things that were **going to** occur, including Martinez's arrival in Billings on November 2, his switching to a different truck after the November 3 stop, and his and Olson's driving together in the teal truck toward Bozeman on November 4. [Emphasis in original.]

Despite the significance of this information, which was not lost to experienced police officers, the Court concludes that this is "perfectly innocent conduct" which added nothing to the police's investigation and decision to stop the vehicle. *See* ¶ 68. The Court apparently

46

believes that it is "perfectly innocent" for a visitor to Billings to change vehicles for his return trip after he is stopped by police and dispossessed of the illegal drugs in his car. This activity may appear to be "perfectly innocent" to judges in Helena, but it is anything but innocent to trained police officers on the street, and it is the officers' viewpoint through which we are to assess the information. *Gopher*, 193 Mont. at 194, 631 P.2d at 296. Further, this Court has previously acknowledged that such "innocent" travel information is highly relevant, and can form the basis of confirming an informant's report, as well as a subsequent stop or arrest. *See State v. Griggs*, 2001 MT 211, ¶ 43, 301 Mont. 366, ¶ 43, 34 P.3d 101, ¶ 43. The Court should so conclude here.

¶94   In his presentation at oral argument, Attorney General Mike McGrath offered these comments:

> The officers involved in this case did what we told them to do when we do training. They've done what this court asked them to do . . . . They did not make a stop until they determined that they had a particularized suspicion to do that. . . . I mean, they did this right. They spent time developing the corroboration that this court requires them to do. And I think if you look at all the facts, you say that the police officers in this case did what we asked them to do. They did the right thing and I don't think they should be penalized. Clearly, Judge Fagg made the right decision.

In stark contrast to the Attorney General's assertion that the police "did this right" by collecting the necessary evidence to justify the stop, the Court concludes that the police had no legitimate evidence at all. The Court has deftly pruned, snipped and trimmed all the pieces of the police's investigation so that nothing remains of their work except "innocent conduct" and "untrustworthy information." The Court has abandoned the totality of the

47

circumstances test for a narrow and rigid application of standards which bears no resemblance to practical reality. While I do not minimize the Attorney General's concern that we not penalize the officers, the larger problem is that this decision will eventually penalize all citizens by diminishing the officers' ability to protect their public safety.

¶95   I dissent.

_____
                          Justice

Justice Patricia O. Cotter dissents.

¶96     I too dissent from the reversal of the District Court. Like Justice Rice, I agree with the Court's application of our informant reliability standards to stops which are premised on particularized suspicion. I further agree that there was sufficient particularized suspicion to justify the stop of the defendants. I would affirm based upon our holding in *Pratt*, to the effect that an officer may infer that information provided by an informant is based on an informant's personal observations if the information contains enough detail to establish that it has not been fabricated. See ¶ 86 of Justice Rice's dissent. I would further note in response to the Court's conclusion that the informant had "uncertain liability for falsely reporting" (¶ 64), that this informant *was* at risk for providing false information, in that she was on probation at the time she gave her information to authorities, and presumably was therefore subject to probation revocation if she violated the law.

¶97     With *Pratt* as legal backdrop, and given the considerable and unique set of facts with which the District Court was faced, I would simply conclude that the District Court's findings that the officers had information from a reliable source that the defendants were transporting drugs and that the police sufficiently corroborated the informant's tip were not clearly erroneous. While we all wish the record was better--and I agree with the Court that we should not have to read between the lines to find a sufficient indicia of reliability--no clear error was committed by the District Court. There is ample legal support in *Pratt* for the District Court's findings. I would therefore affirm.

                                                      Patricia Cotter
                                              _____
                                                           Justice

49